Probate Court, Grafton County
No. 7899

IN THE MATTER OF JAMES DOE

April 7, 1978

New Hampshire Legal Assistance, of Lebanon (Richard V. Aborjaily orally), for Debbie Doe.

David H. Souter, attorney general (David W. Marshall, attorney, orally), for the State.

DOUGLAS, J. This is an appeal from a determination of the Grafton County Probate Court (Jones, J.) terminating the parental rights of Debbie Doe over her son, James. RSA 170-C:5 I (Supp. 1975). The termination decree was grounded upon evidence that Mrs. Doe had made only minimal efforts over a sixteen-month period to communicate with him, and she had therefore abandoned him within the meaning of RSA 170-C:5 I (Supp. 1975). We affirm.

Robert and Debbie Doe are the parents of four-year-old James, who was born on March 2, 1974, and lived with both parents for six months. On September 23, Mrs. Doe was voluntarily admitted to the Vermont State Hospital. Shortly thereafter, James' father placed him in a foster home, and he remained there until October 26, 1975, after which he resumed living with his father. Nine months later, in June 1976, Robert Doe obtained a final decree of divorce and also relinquished his parental rights over his son. James was again placed in a foster home.

Mrs. Doe was released from the hospital before James was returned to his father's custody in 1975. She was informed of her son's

whereabouts and was encouraged to visit him. On April 1, 1975, Mrs. Doe met with Thurlow Rowe, a representative of the New Hampshire Division of Welfare. Mr. Rowe encouraged Mrs. Doe to visit her son, offered transportation assistance, and told her to call collect anytime she wanted to arrange visits with her son. During the next three months Mrs. Doe did not contact Mr. Rowe, although he had tried to arrange appointments for her to visit her son. After James returned to live with his father, Mrs. Doe made several such appointments but kept only one, which was on her son's birthday. Mr. Rowe had no further contact with Mrs. Doe until he informed her on July 2, 1976, that the welfare division was petitioning for custody of the child. Although her visitation rights were not obstructed, Mrs. Doe saw her child only twice from the time of her release until the final conversation with Mr. Rowe.

■■ By decree dated December 3, 1977, the probate court terminated Mrs. Doe's parental rights and gave custody to the welfare division. Mrs. Doe attacks the decree on two grounds. She first argues that the general purpose clause of RSA 170-C:1 (Supp. 1975) and division of welfare employee guidelines preclude termination of parental rights under RSA 170-C:5 I (Supp. 1975) if the State has not provided the parent with the full panoply of available supportive services. Such a contention is not supported by RSA ch. 170-C (Supp. 1975). Parental conduct resembling that of Mrs. Doe is specifically addressed in RSA 170-C:5 I (Supp. 1975). "If in the opinion of the court the evidence indicates that such parent has made only minimal efforts to support or communicate with the child, the court may declare the child abandoned." Neither general legislative nor administrative objectives and goals create a legal right for individuals. If Mrs. Doe's argument were accepted, any and every objective or goal enunciated by the legislature or a governmental agency could be enforced by the judicial branch as an individual legal right. The role of the judiciary does not encompass such an expansive responsibility.

■■ Mrs. Doe also argues that the finding of abandonment was not supported by clear and convincing evidence. She submits that since the welfare division initially obtained custody of her child without her consent the child was not abandoned within the meaning of RSA 170-C:5 I (Supp. 1975). As recently as last year in *State v. Doe*, 117 N.H. 562, 374 A.2d 1186 (1977), we responded to an identical argument saying:

[A] finding of abandonment is not precluded merely because the initial separation of the mother and child resulted

from a court order and against the will of the mother. That, of course, is a factor to be considered on the question, but subsequent conduct on the part of the parent thereafter may be found to constitute abandonment. The fact that the initial involuntary taking would not constitute an abandonment does not 'foreclose the possibility that by action or non-action subsequent to the [court] proceeding the parent can be guilty of an abandonment.'

*Id.* at 563–64, 374 A.2d at 1187 (citations omitted). Thus it is only relevant, not controlling, that her son was in the legal custody of the division of welfare during this time. The question then becomes whether Mrs. Doe's conduct after her release constituted abandonment of her child. The determination of fact constituting abandonment rests squarely within the province of the probate court, RSA 567-A:4 (Supp. 1975), and the court's decree will not be disturbed unless as a matter of law, it is plainly erroneous. *See State v. Doe*, 117 N.H. at 562, 374 A.2d 1187.

■ After viewing the record, we cannot say that the decree was plainly erroneous. Mrs. Doe knew that she could freely visit her son and that transportation would be provided if necessary. Yet she only visited him twice in a sixteen-month period. This conduct evinces a total lack of acknowledgement of her parental duties.

Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with ... immediate and continuing physical and emotional needs). The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited. *In re Smith's Adoption*, 412 Pa. 501, 505, 194 A.2d 919, 922 (1963).

The probate court properly found that the mother had abandoned her child.

*Exceptions overruled.*

LAMPRON, J., did not sit; the others concurred.