Belknap County Probate Court
No. 79-410

## *In re* DIANA P.

December 10, 1980

*Michael R. Chamberlain,* of Manchester, by brief and orally, for the foster parents.

*Snierson, Chandler & McKean,* of Laconia (*John P. Chandler* orally), for the natural mother, Beverly P.

*Hanrahan, Brennan & Michael,* of Manchester (*William B. Brennan* orally), for the New Hampshire Division of Welfare.

*McLane, Graf, Raulerson & Middleton P.A.,* of Manchester (*Charles A. DeGrandpre* orally), for Child and Family Services of New Hampshire, amicus curiae.

DOUGLAS, J. The central issue in this case is whether people who receive children into their homes through the New Hampshire Division of Welfare's foster parent program have standing to bring a proceeding under RSA ch. 170-C to terminate the rights of the natural parents. We hold that they do.

Diana P., the third of three children of Edgar and Beverly P., was born on October 30, 1973. At the time of Diana's birth, Beverly and Edgar were separated. Responding to several complaints about Beverly's ability to care properly for her

children, the division filed a neglect petition in Laconia District Court in March 1974. The court found that Beverly had neglected the children and awarded temporary custody of the children to the division. With Beverly's consent, the division placed the children in a foster home. Because this home became unsatisfactory after four months, the division moved Diana's brothers to a second foster home and placed Diana, who was then eleven months old, in the home of Anne and Bruce B., the plaintiffs in this case.

Although Beverly was incapable of caring for Diana at the time the division gained custody of her children, she remained in contact with the division and visited Diana only irregularly. There is evidence, however, that by 1977 Beverly had acquired certain mothering and homemaking skills that she previously lacked. In late 1977, therefore, the division informed Diana's foster parents that it intended to return Diana to Beverly's care. On December 19, 1977, Anne and Bruce B. filed a petition for termination of parental rights under RSA ch. 170-C in Belknap County Probate Court. On October 25, 1978, the Probate Court (*Burlingame*, J.) terminated Beverly's and Edgar's parental rights with respect to Diana. Beverly and the division appealed pursuant to RSA 170-C:15, and all questions of law were reserved and transferred to this court.

The key issue in this case is whether Anne and Bruce B. may bring a proceeding to terminate the parental rights of Beverly. RSA 170-C:4 II provides: "A petition for termination of the parent-child relationship may be filed by . . . [t]he guardian of the person or the legal custodian of the child or the person standing in loco parentis to the child."

In their termination petition the plaintiffs alleged that they stood in loco parentis to Diana, conceding that the division was her legal custodian. In its final order, the probate court found that the plaintiffs stood in loco parentis to Diana and therefore had standing to petition for termination of Beverly's parental rights under RSA 170-C:4 II. We agree.

■ ■ Generally, courts interpret words and phrases that are defined in the common law according to their common-law meanings, unless defined by the statute in which they appear. 2A C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION § 50.03 (4th ed. 1973). Because RSA ch. 170-C does not define "in loco parentis", we will apply the generally accepted common-law definition. Under the common law as it now stands, and as it stood in 1973 when the General Court enacted the statute, a person in

loco parentis is one who intentionally accepts the rights and duties of natural parenthood with respect to a child not his own. *See Niewiadomski v. United States*, 159 F.2d 683, 686 (6th Cir.), *cert. denied*, 331 U.S. 850 (1947); 59 AM. JUR. 2d *Parent and Child* § 88 (1971).

■ ■ The existence of the parental relationship is a factual question. *Dodd v. United States*, 76 F. Supp. 991, 995 (W.D. Ark. 1948). The fact that a child is placed by an agency with foster parents may weigh against a finding that the foster parents stand in loco parentis to the child, but it is not conclusive. *D'Auria v. Liposky*, 197 Pa. Super. Ct. 271, 274, 177 A.2d 133, 134 (1962). The ultimate determination depends upon a consideration of all the facts.

■ Providing for a child's financial support is one of the duties of parenthood. The record indicates that the division has paid to the plaintiffs eighty-one dollars per month for Diana's support. While some courts have held that the mere receipt of public money bars in loco parentis status, *Miller v. Davis*, 49 Misc. 2d 764, 268 N.Y.S.2d 490 (1966), others have taken a broader view, *Lorden v. United States*, 83 F. Supp. 822 (D. Mass. 1949). The amount paid to the B.'s is hardly sufficient to demonstrate that the primary responsibility for Diana's support is the division's and not the foster parents'. The cost of properly feeding, clothing, transporting, housing, and caring for a growing child Diana's age clearly exceeds twenty dollars per week. *See, e.g., How Much Does a Kid Really Cost?*, PHILADELPHIA MAGAZINE, Oct. 1978, at 171; (estimating expenses of $29,585 for raising a child from age one through five); Hyatt, *Costs of Being a Parent Keep Going Higher*, WALL ST. J.,Oct. 2, 1980, at 33, Col. 3.

■ ■ The amount of time the child has lived with her foster parents is another factor in determining whether they stand in loco parentis. Although a biological family does not exist, a psychological one has arisen in the time that Diana has lived with the B.'s. It is the foster parents who would be at home when Diana gets off a school bus, prepare her meals, read to her, tuck her into bed at night, calm her fears, give her medicine, and hold her in their arms. It is they, and not the division of welfare, who take her on trips, answer her questions, bandage her cuts, and see that she is clean and dressed appropriately. In a factually similar case, we held that a couple who had raised an unrelated child from the age

of four months to six years stood in loco parentis. *See Durivage v. Vincent,* 102 N.H. 481, 161 A.2d 175 (1960).

■ To conclude that foster parents can never stand in loco parentis to a child in their care would be unrealistic. The foster parents, however, should have had the child or children in their home long enough to have formed a "psychological family". While a few weeks would not be long enough, at least two or three years would seem sufficient to convert a temporary foster parent status into that of in loco parentis in the psychological bonding sense, although the time may vary in particular cases. The New York legislature, for example, has provided that foster parents have standing to petition to terminate parental rights if they have cared for the child for at least eighteen months. *N.Y. Soc. Serv. Law* § 392 (McKINNEY) (Supp. 1979–80).

■ Our finding in this case is reinforced by the legislative history of RSA chs. 170-B and 170-C. See Bianco, Chamberlain and DeGrandpre, *The New Hampshire Adoption Statute: An Overview,* 18 N.H.B.J. 199 (1977) (hereinafter Bianco). In 1973 the Governor's Commission on Laws Affecting Children introduced to the General Court proposals for a new adoption law (RSA ch. 170-B) and a new termination statute (RSA ch. 170-C). The commission presented these pieces of legislation as "companion" bills. II N.H.H.R. JOUR. 1765–66 (1973). One reason for enacting these laws was to facilitate the adoption of children by removing "arbitrary and broad restrictions" on who could adopt and to enable the courts to respond to the varied circumstances of individual cases. Bianco, *supra* at 206.

RSA 170-B:4 IV provides foster parents with the right to petition the probate court to adopt a child who is in their care. The petitioner must show either that the child's natural parents have consented to the adoption or that consent is not required, RSA 170-B:12 II, as in cases in which courts have terminated parental rights, RSA 170-B:6 II. The facts of this case demonstrate that the legislative purpose in enacting the statute could be frustrated by a narrow reading of RSA 170-C:4 II, because it would effectively preclude foster parents who have a statutory right to petition for adoption from doing so.

An apparent purpose of the foster family program is to encourage natural parents who are temporarily incapable of maintaining a proper home to consent to their children's placement in foster care. The division asserts that depriving foster

parents of termination rights is consistent with this objective. It is easy to see that caring natural parents who hope to reunite eventually with their children would be much less likely to consent to temporary foster care placement if they knew that the foster parents could bring an action to permanently dissolve the natural parent-child relationship. But after a long period of separation from the natural parent, a child may look upon his foster parent as his psychological parent. At that point, any change in custody based solely on a biological relationship might be emotionally harmful to the child. Note, *Alternatives to "Parental Rights" in Child Custody Disputes Involving Third Parties,* 73 YALE L.J. 151, 159 (1963).

This case presents a situation where the division of welfare is legal custodian of Diana, yet a status of in loco parentis has arisen out of the foster parents' relationship as well. Usually there is no conflict because the division as an "authorized agency" would petition to terminate and the foster parents would then adopt under RSA 170-B:4 IV. The division in this instance did not seek termination and, in fact, planned to reunite mother and child. Not all foster families are interested in adopting their wards. In some cases, the children are old enough that the psychological bond with their natural parents continues. The real crisis is that hundreds of children remain in limbo between natural parents they rarely see and their foster homes. The cost in terms of emotionally disturbed children must be great. The division should be more aggressive (with sufficient legal manpower provided) to assure that cases get to court early enough so that a child may have some direction for his or her life.

Last year in New Hampshire, 58 foster children were adopted, and 188 were returned to their natural families. Over half of all foster children had been in foster care for at least two years, 29% for over five years. There were 973 children in foster care among 768 licensed family homes as of April 1980. It is clear that an inflexible rule holding that foster parents can never stand in loco parentis to a child does not promote the legislative efforts at striking a balance in this delicate and difficult area of human relationships. We are not holding that all foster parents have rights superior to those of anyone else; we conclude merely that these foster parents had standing to petition to terminate because of their lengthy role in loco parentis to this child. If we are in error in construing the two chapters at issue, the General Court may, of course, correct us or clarify this crucial area of the law. In

light of the split opinions in this case, such legislation is obviously necessary.

We next consider the standard of proof required in proceedings to terminate parental rights. In *State v. Robert H.* _____ , we recognized that "the rights of parents over [the family] are . . . natural, essential, and inherent rights within the meaning of New Hampshire Constitution, part 1, article 2" and held that "the government must prove its case under chapter 170-C beyond a reasonable doubt before the permanent termination of liberty and natural rights of parents guaranteed under the New Hampshire Constitution . . . can occur." 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978). For the reasons set forth in *Robert H.*, all four justices sitting in this case reaffirm that holding.

The amicus curiae suggests that some children may be languishing in foster homes because the division cannot meet its burden under *Robert H.* It was never this court's intention to obstruct the adoption process. We note, however, that the discussion in *Robert H.* relating to how the division must prepare its case might have confused both the division and the probate judges who must grapple with these difficult termination cases. *Robert H.* should not be read to require the division to do a perfect job in every termination case. In holding the division to its own regulations, in an RSA 170-C:5 III case, which require it to make "every effort" to build a record and to work with the natural parents to enable them to "provide a family for their own children", we did not mean to impose on the division standards that it cannot meet. Judges must take into account the realities of the division's staff and dollar limitations. Certainly there are not enough psychiatrists, psychologists, therapists and counselors available to the division to enable it to build the "perfect" case, and the division need not meet such a standard to make its termination case under *Robert H.* It must show, however, that it did the best that could be done with its own staff and resources and with the limited private resources available in this State to work with parents in an RSA 170-C:5 III case. Once the division has shown satisfactorily that it has made its best efforts to rehabilitate the parents and that such efforts have failed, the division may proceed to seek termination of the parents' rights.

We have already held that the "dominant consideration of the court" in termination proceedings is the welfare of the child and that the welfare of the child must prevail over conflicting

interests of the parent. *In re Fay G.*, 120 N.H. 153, 156, 412 A.2d 1012, 1015 (1980); *see In re Brenda H.*, 119 N.H. 382, 388–89, 402 A.2d 169, 173–74 (1979). Thus, although parental rights are to be protected, procedural safeguards, such as the burden of proof in termination proceedings, must not unduly interfere with the primary purpose of termination proceedings, determining the best interests of the child. *See In re Lester*, 417 A.2d 877, 880 (R.I. 1980); RSA 170-C:1.

■ Upon review of the record in this RSA 170-C:5 I "abandonment" case, we conclude that there was evidence during nine trial days upon which the probate judge could find beyond a reasonable doubt that an abandonment had occurred and that it was in the best interests of Diana to terminate Beverly's parental rights. The foster parents are educated people who have operated a successful business and who have maintained a fine home for Diana and their natural children. Beverly is relatively unskilled, and she has had a history of violent "boyfriend" problems that demonstrate her immaturity.

■ ■ Furthermore, there was evidence that despite the best efforts of a fine social worker, Beverly had abandoned Diana within the meaning of RSA 170-C:5 I and that it was in the best interests of the child to terminate parental rights. In this State a mere "flicker of interest" is not sufficient to bar a finding of abandonment. RSA 170-C:5 I does not require a court to find that a parent purposely sought to abandon a child before it may terminate parental rights. It may declare the child abandoned if it finds objectively that the parent has made "only minimal efforts to support or communicate with the child." *Id.; see In Interest of T. S. L.*, 409 A.2d 332 (Pa. 1979); *Matter of Adoption of David C.*, 387 A.2d 804, 807 (Pa. 1978).

■ In 1974 Beverly did not even send Diana a Christmas or birthday card. Although she talked about getting Diana back, time with her boyfriend was more important to her. During a twenty-month period from 1974 to 1976, Beverly visited Diana only three times. In January 1977, a new boyfriend started strangling Beverly and beat her. After a repeat bout in April, she broke up with him. Only then did she decide in earnest to seek Diana's return. Because "the determination of fact constituting abandonment rests squarely within the province of the probate court" and is not "plainly erroneous", we will not disturb it. *In the Matter of*

*Doe*, 118 N.H. 226, 229, 385 A.2d 221, 223 (1978). Because of an equally divided court the ruling below is

*Affirmed.*

BOIS, J., did not sit; GRIMES, C.J., concurs in this opinion.

BROCK, J., with whom KING, J., concurs, issued the following opinion:   The critical issue in this case is whether the foster parents stand in loco parentis to Diana P. Under RSA 170-C:4 II, such a relationship must exist in order for the foster parents to have standing to bring this petition.

Reliance upon *Niewiadomski v. United States*, 159 F.2d 683, 686 (6th Cir.), *cert. denied*, 331 U.S. 850 (1947), as authority for holding that the foster parents in this case have standing to bring a petition for terminating parental rights is misplaced. Applying the standard of that case for determining in loco parentis status leads to the conclusion that the foster parents in this case do not stand in loco parentis.

According to *Niewiadomski*, the term in loco parentis "refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship . . . ." *Niewiadomski v. United States*, 159 F.2d at 686. The incidents of a parental relationship include the duty to educate, care for physical or mental disability, the right to custody and control along with the disciplinary authority over the child. *Id.* at 686. In the present case, the foster parents, because of the control exercised over them by the department of welfare pursuant to RSA 170-E:1 X, :3, :9, assumed none of these incidents. In a publication entitled *Standards for Foster Family Care*, the division of welfare has set forth rules and regulations for foster parents.

Under the rules and regulations of the department of welfare, the foster parents do not have the legal authority over Diana P. that a natural parent normally has over his own child. A portion of these rules and regulations in some detail provide:

"F. Relative to Reports and Records

1. Prior to accepting a child from a source other than the agency, foster parents shall notify the agency of their intent and in so doing shall not exceed their licensed capacity.

2. Foster parents shall keep the agency informed of the

children's progress while in their care. They shall consult with the agency regarding care, training, education and plans for the child whenever more than day-to-day routine is involved.

3. Foster parents shall secure the approval of the child's legal custodian before making plans for the care of the child by other persons for any period in excess of 48 hours.

4. Foster parents shall consult with the agency before taking or allowing the child to go on vacation trips or visits. Visits to natural parents shall be according to prearranged plans approved by the agency.

5. Foster parents shall notify the agency as soon as possible or within 24 hours of emergencies involving the foster child. This includes serious illness or injury involving medical treatment, unauthorized absence from the home, or other situations of which prudence suggests the legal custodian be notified. This requirement in no way relieves the foster parents from first taking action, such as obtaining emergency medical treatment for the child.

6. Foster parents shall notify the agency immediately, but not more than 24-hours, in the event of the death of any child in their charge, giving the name of the child, cause and date of death, duration of last illness and addresses of the attending physician and undertaker.

7. Foster parents shall allow the agency a minimum of two weeks to make suitable plans for a child when the foster parents have requested the child's removal from their home except when removal is related to illness in the foster family.

8. Foster parents shall keep confidential all information concerning the child in their care and his/her family except when such known information is required for treatment of an illness in an emergency.

9. A registry shall be kept by the foster parents containing:

a. name and birth date of each child;

b. date of admission and discharge;

c. dates of parents' and relatives' visits

10. Foster parents shall provide a safe place to keep important papers given to the foster parents by the agency, school, doctor, or other important resource.

G. Relative to Discipline

1. No child shall be subjected to verbal or physical abuse, derogatory remarks about himself or members of his family or to threats to expel the child from the foster home.

2. No child in care shall be deprived of meals, mail or family visits as a method of discipline.

3. Each child shall be contructively [sic] disciplined according to his age, needs, behavior and customary family patterns or discipline.

4. With the exception of number three (3) above, no corporal punishment shall be administered.

H. Relative to Religion

Foster parents shall be responsible for the protection and fostering of the particular religious faith of the children served, where applicable.

I. Relative to Children's Rights

1. Foster parents shall keep confidential information about the child and provide such information only to those individuals and agencies which require definite information to meet their responsibilities to the child.

2. Foster parents shall assure legal representation for a child when necessary by notifying the child's agency, parents, or other person responsible for the child."

It should be obvious that the foster parents are legally barred from assuming the full responsibilities of parental authority. Those responsibilities are, by law (RSA ch. 170-E), reserved to the

division of welfare, which in this instance strongly opposes the termination petition. While the foster parents do provide aid and assistance to Diana P., aid and assistance alone is not sufficient to establish the status of in loco parentis. *Niewiadomski v. United States, supra* at 686. Moreover, a portion of the financial support which the foster parents provide has been reimbursed to them by the division of welfare.

Both the theory that the foster parents have become Diana P.'s "psychological family" and the fact that they must incur out-of-pocket expense have been raised in support of the position that the foster parents here stand in loco parentis. If these criteria are to be determinative, many foster parents could be encouraged to challenge a natural parent's right to custody. Implicit in the latter argument is the distasteful notion that foster parents may purchase their way into standing under RSA 170-C:4 II. If *State v. Robert H.* _____ , 118 N.H. 713, 393 A.2d 1387 (1978), remains the law in this State, it is inconsistent to allow foster parents to purchase standing and also to criticize the tendency of social workers "to favor continued placement in foster care with a generally high status family. . . ." *State v. Robert H.* _____ , *supra* at 717, 393 A.2d at 1390.

Under the standard of *Robert H.*, it is error to allow the termination of Beverly P.'s parental rights in this case. In *Robert H.*, we held that "the government must prove its case under [RSA] chapter 170-C beyond a reasonable doubt before the permanent termination of liberty and natural rights of parents . . . can occur." *State v. Robert H.* _____ , *supra* at 716, 373 A.2d at 1389. We then added that the division of welfare must prove that it has made "every effort" and that it has "worked with the parents" before it can take "so drastic a step as to sever irrevocably the parental ties to the children." *State v. Robert H.* _____ , *supra* at 719, 393 A.2d at 1387. In this case, the division of welfare is contesting the petition for termination of parental rights. It seems only logical that if we are to apply strict scrutiny to parental termination statutes, *State v. Robert H.* _____ , *supra* at 716, 393 A.2d at 1389, then it follows that we must also strictly construe the statutory provisions concerning who has standing to bring such petitions and not take a "broad view" on which parties can bring such a petition.

In *Robert H.*, we directed the division of welfare to "work affirmatively with the [parent] and provide and arrange for the appropriate social service agency intervention" in order to assist the natural parents in becoming responsible parents. *State v.*

*Robert H.* _____ , 118 N.H. 713, 720, 393 A.2d 1387, 1391 (1978). Here, the termination order is being enforced over the division's objection and consequently it appears that the division itself does not feel that all appropriate assistance has been given to the natural parent. These two holdings are contradictory. If there is to be a lesser standard in privately brought termination petitions, which does not require the exhaustion of the division's resources to assist the natural parents, then the constitutional safeguards announced in *Robert H.* have become meaningless.

There is no fair basis to distinguish between termination petitions brought by foster parents and those brought by the State because "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." *See Smith v. Organization of Foster Families*, 431 U.S. 816, 845 (1977). Such a partnership connotes significant State involvement. In this case, the State's involvement in the partnership is particularly troubling because no finding has been made that Diana P.'s natural mother is presently unfit to assume her parental duties and obligations. The lack of such a finding is critical because "the Due Process Clause [is offended when] 'a State . . . attempt[s] to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' " *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), *quoting Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63 (1977) (*Stewart*, J., concurring). This court approved of this very language in *State v. Robert H.* _____ , 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978).

Because we are dealing with a fundamental right requiring the application of strict judicial scrutiny, *State v. Robert H.* _____ , *supra* at 716, 393 A.2d at 1389, foster parents should also be required to demonstrate, beyond a reasonable doubt, that Diana P.'s natural mother is·unfit to reassume her role as the child's natural custodial parent. This burden must be imposed upon foster parents because their very status has been created by the State. It makes little sense to require the State to demonstrate the unfitness of a natural parent and not to require the State's designees in custodial arrangement, the foster parents, to meet the same requirement.

The designation of foster parents with the natural parents' consent should not operate as a waiver of the latters' natural custodial rights. *Bezio v. Patenaude*, F. 2161 Mass. Supreme

Judicial Court, Slip Op. at 17 (Sept. 22, 1980). It should be obvious that the result reached today will only hinder the division of welfare's efforts to render assistance to natural parents in need of counseling and assistance. Few natural parents will have an incentive to cooperate with the division of welfare's efforts to place their children in foster homes when it is publicized that foster parents have standing to bring a petition to permanently terminate their rights to custody.