6th Circuit Court — Concord Family Division
No. 2011-737

IN THE MATTER OF MATTHEW BORDALO AND MEAGAN CARTER

Argued: May 3, 2012
Opinion Issued: October 30, 2012

*Clark Law Offices*, of Manchester (*Deborah M. Shepherd* on the brief), for the petitioner.

*Orr & Reno, P.A.*, of Concord (*Jeremy D. Eggleton* on the brief and orally), for the respondent.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Pamela A. Peterson & a.* on the brief, and *Ms. Peterson* orally), for the intervenors.

HICKS, J. The respondent, Meagan Carter (Mother), appeals a decision of the Concord Family Division (*Gordon*, J.) awarding primary parenting responsibility of her minor child (Daughter) jointly to the petitioner, Matthew Bordalo (Father), and the intervenors, John and Karen Bordalo, the Father's parents. We reverse and remand.

I

The following facts are drawn from the trial court's final order. Father and Mother had a brief relationship that resulted in Daughter's birth in 2006. Mother married Richard Carter in October 2008 and had a child born of their marriage. Mother and Father entered into a parenting agreement in July 2009 whereby Daughter would live with Mother during the week and with Father from Friday to Monday. At that time, Mother lived in Kittery, Maine, and Father lived with his parents, the Bordalos, in Unity, New Hampshire.

Father filed a petition for contempt against Mother in November 2009, asserting that she had moved with Daughter to a more remote location in Maine, making it impossible to exercise his parenting time according to the agreement. The court found Mother in contempt, and ordered the parties to find a suitable location between their homes to exchange Daughter. Father subsequently filed another petition for contempt, this time asserting that Mother had prevented him from seeing Daughter at all. In response, the court again made a contempt finding and ordered the parties to exchange Daughter at each other's home.

In March 2010, Mother and Father each moved to modify the parenting plan, and a guardian ad litem (GAL) was appointed. By August 2010, Mother had moved back to Kittery and the court had adjusted the plan to afford Father time with Daughter on alternating weekends to reduce the "opportunity for conflict" arising out of the previous plan. Sometime after that order, Richard Carter was arrested in a domestic violence incident and the Maine Department of Social Services identified concerns it had about Daughter's well-being, particularly with respect to exposure to her maternal grandmother. In December 2010, the court ordered Daughter's contact with her maternal grandmother to be supervised and authorized the GAL to make certain interim decisions in Daughter's interests.

In March 2011, prior to the final hearing, the Bordalos were permitted to intervene and requested parental rights over Daughter, asserting that it would be in her best interests to reside with them "to prevent significant psychological harm." A final hearing took place in April 2011.

At the hearing, the GAL opined that Daughter was being harmed in Mother's care and recommended that she reside with the Bordalos. She noted that Daughter is a "troubled child" who has exhibited violent behaviors toward animals, her younger half-sister, and others in the family. The GAL also opined that Mother is in a poor position to support Daughter in light of Daughter's behavioral problems. The court noted in its June 2011 final order that Richard Carter had been arrested once for endangering the welfare of Daughter and another time for domestic violence against Mother; the record does not indicate the legal resolution of those arrests. The court also noted that the "authorities" had expressed concern that Daughter's emotional and mental health had been harmed due to the influence of the maternal grandmother, violent incidents in the home, and a "volatile" relationship with Mr. Carter. The GAL also expressed concern that Mother lacks "understanding of the emotional boundaries which should exist between a parent and a child." At the same time, the court noted that Mother "does, in fact, have the ability to be a competent parent for [Daughter]; in her care, [Daughter] has been well fed, has been provided for and has developed intellectually."

The court also stated that Father is "not recognized as a particularly competent parent." Both the GAL and Daughter's therapist believed that he lacked parenting skills due to a "developmental disability or information processing deficit that makes it hard for him to understand his responsibilities as a parent." Although a "devoted" father, he was not actively engaged in Daughter's counseling, therapy, or vocational rehabilitation. Father admitted at trial that he would need help from his parents to care for Daughter permanently. The GAL and Daughter's therapist also believed that Karen Bordalo provided the most "safe, sound, stable and nurturing" environment for Daughter.

The trial court awarded primary parenting and residential responsibility jointly to Father and the Bordalos, and awarded weekend parenting time to Mother. Under the new parenting plan, Father and the Bordalos were to "share in the responsibility for making major decisions" and consult with Mother "when feasible." Mother was expressly prohibited from "interfer-[ing] with the authority of the Bordalos in making the final decision." After a motion to reconsider was denied, Mother appealed.

II

The trial court has wide discretion in matters involving parental rights and responsibilities under RSA 461-A:6 (Supp. 2011), and we will not overturn its determination except when there has been an unsustainable exercise of discretion. *In the Matter of R.A. & J.M.*, 153 N.H. 82, 93 (2005) (plurality opinion); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining

unsustainable exercise of discretion standard). However, we apply a *de novo* standard of review both to the constitutionality of a statute, *Appeal of Blizzard*, 163 N.H. 326, 331 (2012), and to the trial court's application of the law to the facts, *State v. Michelson*, 160 N.H. 270, 272 (2010).

Mother argues that the parenting award cannot be sustained because "the strict test for awarding custody of a minor to grandparents over the express wishes of a fit parent was not met." The Bordalos and Father, on the other hand, contend that the court properly exercised its discretion to award "primary residential and decision-making responsibility" jointly to them.

 It is well-established that parents have a fundamental liberty interest in raising and caring for their children. *See In the Matter of Nelson & Horsley*, 149 N.H. 545, 547 (2003); *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion). As Justice O'Connor stated for the plurality in *Troxel*: "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (O'Connor, J.).

> We have adopted the *Troxel* plurality's ruling that fit parents are presumed to act in the best interest of their children. . . . Provided that a parent is fit, there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*In re Guardianship of Reena D.*, 163 N.H. 107, 111-12 (2011) (quotations and citations omitted). Moreover, "[t]he fundamental liberty interest of . . . parents in the care, custody and management of their children does not evaporate simply because they have not been model parents." *In the Matter of Jeffrey G. & Janette P.*, 153 N.H. 200, 204 (2006) (quotations omitted). Even though their parenting skills are less than ideal, biological and adoptive parents are presumed to be fit parents until they are found to be unfit under either RSA chapter 169-C (abuse and neglect proceedings) or RSA chapter 170-C (termination of parental rights). *Id.*

Against this constitutional backdrop, RSA 461-A:6, V provides:

> If the court determines that it is in the best interest of the children, it shall in its decree grant reasonable visitation privileges to . . . the grandparents of the children pursuant to RSA 461-A:13. Nothing in this paragraph shall be construed to prohibit or require an award of parental rights and responsibilities to a stepparent or grandparent if the court determines that such an award is in the best interest of the child.

The trial court, relying upon *In the Matter of R.A.*, construed the second sentence of this provision to allow a trial court to award parental rights and responsibilities to a stepparent or grandparent in appropriate circumstances even when the court has not found the parent who is denied such rights and responsibilities to be unfit. *In the Matter of R.A.*, 153 N.H. at 94 (interpreting RSA 458:17 (2004) (repealed 2005)). Mother does not challenge this interpretation of RSA 461-A:6 in the instant case.

*In the Matter of R.A.* involved a child's grandmother who sought to intervene in a custody dispute between the child's mother and father, asking for primary "physical custody" and joint "legal custody" with the parents. *Id.* at 87. The grandmother "contended that she played the primary parental role in [the child's] life, particularly from 2002 to 2004," and argued that granting her requests would serve the child's best interests. *Id.* at 86, 87. The trial court, however, rejected the grandmother's argument on the ground that, even if former RSA 458:17, VI were construed to permit an award of custody to a grandparent where a natural, fit parent also seeks custody, the statute so construed would be unconstitutional under *Troxel. Id.* at 87. The grandmother appealed, arguing that the statute could be constitutionally applied to grant her custody petition because she had a significant "parent-child" relationship with the child. *Id.* at 88.

*In the Matter of R.A.* produced three separate opinions as to the statute's constitutionality. Two justices, writing in dissent, agreed with the trial court that the statute was unconstitutional on its face in light of *Troxel. Id.* at 111-12 (Dalianis & Duggan, JJ., dissenting). In their view, a statute permitting a custody award to grandparents over the objections of a fit, natural parent ran afoul of the "fundamental right of parents to make decisions concerning the care, custody and control of their children." *Id.* at 112 (quotation omitted). Two justices, concurring in part and dissenting in part, believed RSA 458:17, VI to be constitutional as long as three conditions were established by clear and convincing evidence: (1) the grandparent or stepparent has established an *in loco parentis* relationship with the child; (2) the denial of custody would cause "significant emotional harm" to the child; and (3) the custody award is in the child's best interests. *Id.* at 110 (Nadeau & Galway, JJ., concurring in part and dissenting in part). Their view, echoing Justice Stevens's dissent in *Troxel,* was that courts must "stop treating children as the chattel of their parents. In child custody disputes, the best interests of the child must be paramount." *Id.*; *see Troxel,* 530 U.S. at 89 (Stevens, J., dissenting) (urging a rejection of "any suggestion that when it comes to parental rights, children are so much chattel").

■ Chief Justice Broderick wrote the controlling opinion upholding the statute, provided that a stringent four-part test (hereinafter, "Broderick test") could be satisfied in the case. He stated:

> [A]n award of custody to a . . . grandparent over the objection of a fit natural or adoptive parent is not unreasonable or unduly restrictive of parental rights only if the petitioning party can show by clear and convincing evidence that: (1) the custody award would specifically be in the child's best interest because of a significant psychological parent-child relationship; (2) the custody award only be allowed where the family is already in the process of dissolution; and (3) there is some additional overriding factor justifying intrusion into the parent's rights, such as a significant failure by the opposing parent to accept parental responsibilities. [In addition,] . . . the custody award must be necessary for the State to enforce its compelling interest in protecting the child from the emotional harm that would result if the child were forced to leave the significant psychological parent-child relationship between the child and the . . . grandparent.

*In the Matter of R.A.*, 153 N.H. at 101. Having upheld the statute against a facial attack, the court remanded the case to the trial court for further proceedings. *Id.* at 108.

■ Thus, although the court in *In the Matter of R.A.* was divided both as to whether the statute was constitutional on its face and, as to the majority's judgment that it was, what standard should be employed to make it so, all five justices agreed that it could not be applied simply using a best-interests standard. Applying solely a best-interests standard to adjudicate disputes concerning parental rights and responsibilities between a grandparent and a fit natural or adoptive parent does not comport either with *Troxel*, 530 U.S. at 66, or our precedents recognizing parents' fundamental liberty interest in raising and caring for their children, *see, e.g., In the Matter of Jeffrey G.*, 153 N.H. at 203.

## III

■ The Bordalos contend, at the outset, that "this was a parenting dispute between two natural, fit parents," and, accordingly, argue that the appropriate standard to apply is simply that of the best interests of the child. The trial court, however, applied the Broderick test for awarding primary parenting responsibilities to grandparents, indicating that it considered the dispute to be between Mother and the Bordalos, not simply between Mother and Father. While the court did not deem Father to be

unfit, it did note that he was not "a particularly competent parent," that he had "some kind of developmental disability or information processing deficit that makes it hard for him to understand his responsibilities as a parent," and finally that "he is not able to engage in independent parenting responsibility for [Daughter] and he has specifically recognized this in his testimony." The court also opined that "[o]ne of the best things [Father] has going for him is that he resides with his parents." Furthermore, the court awarded parenting and residential responsibility not just to Father, but also to the Bordalos. For these reasons, we think it readily apparent that the court did not rest its decision upon a simple balancing of the rights between two parents. Although we agree with the Bordalos that a trial court normally has wide discretion in adjudicating parenting disputes, it has no discretion to award parental responsibilities to a child's grandparents as against a fit natural or adoptive parent without satisfying the appropriate constitutional standard for doing so.

The Bordalos next contend, in the alternative, that this standard has been met here: the trial court, they contend, "properly identified and applied the provisions of RSA 461-A:6, as interpreted by [*In the Matter of R.A.*] . . . to determine whether [Father] jointly with John and Karen Bordalo should be granted parental rights and residential responsibility." Mother, on the other hand, argues that *none* of the elements of the Broderick test were established by clear and convincing evidence. None of the parties argues that the Broderick test should not govern parenting disputes between a fit natural or adoptive parent and a grandparent or stepparent.

We assume, for the purposes of this analysis, that the second and third requirements of the Broderick test were satisfied. We note, however, that the facts of this case underscore the uncertain application of these factors. While the trial court's explanation that the family was in "dissolution" because "it was never a coherent family" is arguably accurate as to Daughter's biological parents, it is not self-evident how and whether this factor should be considered in light of the fact that Mother had a family with her husband, Richard Carter, with whom she bore a second child and was raising that child and Daughter together. The court also explained that there was "some additional overriding factor" because of Mother's "failure to provide for [Daughter's] emotional safety and well being" — a conclusion arguably at odds with the observation elsewhere in the final order that "in [Mother's] care, [Daughter] has been well fed, has been provided for and has developed intellectually."

■ ■ Nevertheless, we agree with Mother that the first and fourth requirements of the Broderick test were not satisfied here. The first is that

"the custody award would specifically be in the child's best interest because of a significant psychological parent-child relationship." *In the Matter of R.A.*, 153 N.H. at 101. Elsewhere in his opinion Chief Justice Broderick stated that there must be a "substantial" relationship between the child and the grandparent, "such that denial of custody to that person would be emotionally harmful to the child." *Id.* at 100 (quotation omitted). Whether "substantial" or "significant," the relationship under the Broderick test requires, at the very least, a parent-like relationship in which the grandparent has assumed primary obligations of parenthood, such as responsibility for the child's education and development, on a non-temporary basis. To support its finding that such a relationship had been established, the trial court noted that "Karen Bordalo . . . has been a constant presence in [Daughter's] life from the day of her birth and . . . has provided, it seems, the only consistent, coherent, and comforting parenting role for this child." While this may be true, the record does not provide clear and convincing evidence that the Bordalos' status vis-à-vis Daughter was that of parents rather than that of ordinary — though by all appearances ideal — grandparents. *Cf. In re Diana P.*, 120 N.H. 791, 796 (1980) (noting that a few weeks would not be long enough to establish a "psychological family"), *overruled on other grounds by In re Craig T.*, 147 N.H. 739 (2002); *In the Matter of R.A.*, 153 N.H. at 111 (Nadeau and Galway, JJ., concurring in part and dissenting in part) (indicating concern that prohibiting custody awards to grandparents as against a fit parent "would require that a child *raised for years* by a grandparent" would need to be turned over to a fit parent without considering child's best interests (emphasis added)). Unlike in *In the Matter of R.A.*, in which the trial court had found the grandmother "predominantly responsible" for raising the child for two years prior to trial, *In the Matter of R.A.*, 153 N.H. at 106, here the Bordalos never had primary parenting responsibilities for Daughter. The record reflects that Mother has always assumed such responsibilities except for a short guardianship over the child by Daughter's *maternal* grandmother. That Daughter "resided with" the Bordalos whenever she visited her father under the terms of the previous parenting agreement does not mean that the Bordalos thereby established a "parent-child relationship" with her. *See In the Matter of R.A.*, 153 N.H. at 101. Were this enough to satisfy Cheif Justice Broderick's first factor, almost any child's grandparents would be entitled to sue for parental rights and responsibilities as long as they established a common residence with the child, however temporary. Indeed, the trial court stated in its final order that "the kind of psychological parent-child relationship that was in existence in . . . *In the Matter of R.A.* . . . . has not exactly occurred here [because Daughter] has never

lived with her grandparents on a permanent basis." Thus, the trial court's own findings demonstrate that the first criterion of the Broderick test has not been met.

It follows, then, that the trial court's order would not satisfy the fourth requirement — that the award be necessary for the State to enforce its compelling interest in protecting the child from the emotional harm that would result if the child were forced to leave the significant parent-child relationship between the child and the grandparents. Having held that the record fails to demonstrate the existence of a significant parent-child relationship between Daughter and the Bordalos, we necessarily conclude that the fourth requirement was not met. Indeed, the trial court essentially stated as much when it concluded that "[t]his is not . . . a circumstance where a child is 'forced to leave a significant psychological [parent-]child relationship between the child and . . . grandparent,' because the child has not been residing with the grandparents." (Citation omitted.)

Accordingly, we reverse and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

DALIANIS, C.J., and CONBOY, J., concurred.