## D'Auria *v.* Liposky et ux., Appellants.

Argued November 13, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

Before DUMBAULD, J.

*Anthony Cavalcante,* for appellants.

*Lewis M. D'Auria,* with him *Thomas A. Waggoner,* for appellee.

OPINION BY FLOOD, J., January 16, 1962:

This is an appeal from an order overruling the defendants' motions for a new trial or for judgment n.o.v. following a trial in which the jury awarded the plaintiff $2,000 in her suit to recover sums totalling approximately $7,000 which she allegedly earned and turned over to the defendants while living in their home, upon the defendants' agreement to return them to her when she left their home or married.

1. The motion for judgment n.o.v. was properly overruled. In support of her claim, the plaintiff testified that she and her younger sister were taken away from their natural parents as neglected children in November, 1937, when she was eight years old, and placed with the defendants with whom she continued to live until 1953, when, at the age of twenty-four, she moved to Cleveland, Ohio, and was married.

Plaintiff testified that she began working in a store, which the defendants operated without profit, when she was ten or eleven years old and that she continued to

help out in the store as long as she lived with them. She also dusted and cleaned around the house, washed and ironed clothes and made deliveries of milk from the defendants' cows. After she was graduated from high school in 1947, at the age of eighteen, the plaintiff took a job, and thereafter she continued to work and receive weekly pay checks or unemployment compensation checks until she moved to Ohio. When she was not working, she helped out in the store.

Plaintiff testified that when she brought her first pay check home in July, 1947, the wife defendant, in her husband's presence, told her to hand over the check, that she would save the money for plaintiff until she left home or got married, and that the work which the plaintiff did in the store and around the house would take care of her room and board. Thereafter, the plaintiff turned over all of her checks to the defendants who returned $8.00 to her each week for spending money. Plaintiff testified that she never received any of the money retained by the defendants and that, when she asked for it in April, 1953, the defendants refused to give it to her.

The defendants denied making any such agreement with the plaintiff.

As the able trial judge charged the jury, the parties were free to make any arrangements they wished concerning the disposition of the plaintiff's earnings. The plaintiff's evidence, if believed, was sufficient to support a substantial verdict, and the entry of judgment n.o.v. would have been improper.

2. The defendants seek a new trial because of the action of the court below in ruling as a matter of law that they did not stand in loco parentis to the plaintiff. The court charged, in effect, that the defendants had the burden of establishing that the plaintiff had made a gift of her earnings to the defendants and refused defendants' request to charge that the jury

should determine from the testimony whether the loco parentis relationship existed or to give them appropriate instructions applicable to the rights of persons standing in loco parentis to receive the services and earnings of their unemancipated children in the absence of any agreement or understanding to pay for such services or to permit the child to keep his or her own earnings. See 67 C. J. S., Parent and Child, §§72, 74.

The court based its refusal to charge on this relationship upon the ground that it was a foster home placement and not a parent and child relationship. In its opinion, the court en banc held that the relationship was one of public law under the supervision of the Juvenile Court in which the welfare of the child is the dominant consideration, that the welfare agency which placed the plaintiff or the court could substitute a new home at any time if conditions required it, and that under such public law relationship no private rights vested in defendants which would entitle them to the plaintiff's earnings.

Under the cases discussed below, the fact of placement is not conclusive against the relationship. Although the fact of such placement may weigh against a finding that the defendants stood in loco parentis to the plaintiff, yet the ultimate determination of this question depends upon a consideration of all the facts, and a full review of the testimony is necessary before we can decide whether the evidence of the relationship was so meager that there was nothing to submit to the jury.

Prior to the placement, defendants had requested to be listed for such placements. They did not have any particular children in mind and did not know the plaintiff or her sister at the time of the placement. The children were given no choice or selection as to the home in which they would be placed.

The husband defendant was not gainfully employed at the time of the placement, and the defendants knew they would receive financial assistance for keeping the children. The public authorities paid the defendants $16.00 each month for both children until June 1, 1942, when the defendants began to receive a monthly allotment in the same amount from the pay of their natural father, who was in military service. This allotment was increased to $31.00 monthly beginning November 1, 1942, and continued until July 31, 1945, when the father was discharged from the service.

When asked whether or not the defendants were paid for her keep, the plaintiff testified: "They were paid as far as I know till we were about eighteen years, and then from my father's army pay he would send [an] allotment." Although the defendants' counsel made a motion to strike this testimony, he did not renew the motion after the court deferred ruling upon it, and he permitted the following testimony, elicited during the plaintiff's cross-examination, to remain in the record: "The Court: Q. When did the County quit paying for the two children, if you know? A. I am not sure but I think they pay until you are eighteen, I am not positive."

The plaintiff herself testified that the woman who brought her to the defendants' home subsequently visited her only "once in awhile", "not too often", that the defendants placed her in a private high school after her freshman year and paid for her tuition, that they bought clothes for her and provided her with everything she needed, and that her natural father died in January, 1951.

She testified that her younger sister "was a little bolder" and kept the pay which she earned from an outside job obtained shortly before she was married in 1951. The plaintiff never discussed the matter of her own pay with the defendants after she turned over her

first pay check, never asked the defendants the amount of her "savings", and when she would sign and hand over her pay check, the wife defendant would "cash it or do whatever she did with it or pay a bill". Finally, the plaintiff testified that she used the words "Mother" and "Dad" in addressing the defendants.

The defendants testified that they had one natural daughter and could not have any more children of their own, that they took the children to raise as their own and to "make company" for their own daughter, and that they could have adopted the children but wanted to let them use their own name. They further testified that the children had uncles and aunts who would not accept them, that their natural mother visited them only once, that their natural father was under the influence of alcohol when he visited the children and they refused to speak to him, and that the father "wouldn't give you no answer . . . he would agree with anything you said about the children". There also was evidence that the payments the defendants received were insufficient for the children's support, that the defendants kept them in the "best clothes", took them on trips and gave them money whenever they needed it. The defendants testified that they obtained the plaintiff's first job for her, that they merely accepted and never demanded the plaintiff's check, that her checks, like those of the husband defendant, were put in a common fund, that the plaintiff's earnings were never kept separate and that they were expended with those of the defendant husband during the period the plaintiff lived with them. Finally, the defendants testified that they gave the plaintiff and her sister $100 as wedding gifts, that the plaintiff's sister comes to their home every day, and her three children "practically live" there, and that they raised both children as their own "and are still even raising grandchildren",

Most of our prior cases involving an interpretation of the phrase in loco parentis are decisions reviewing and affirming awards of workmen's compensation on the ground that the claimants stood in "loco parentis" to the deceased employe. In almost all of these cases we have relied upon the following language from a will case, *Robinson's Estate,* 35 Pa. Superior Ct. 192, 195 (1908) (where the testator had maintained a grand-niece whose father was unable to maintain her) : "The proper definition of a person in loco parentis to a child, is a person who means to put himself in the situation of a lawful father of the child with reference to the father's office and duty of making provision for the child . . ." In the light of this definition, the relation in loco parentis has been held to exist in the case of many different types of actual relationship to the claimant: *Boyle v. Dealer's Transport Company,* 184 Pa. Superior Ct. 38, 132 A. 2d 709 (1957) (half-brother) ; *Fitzpatrick v. Hudson Coal Company,* 159 Pa. Superior Ct. 53, 46 A. 2d 589 (1946) (grandfather) ; *Flinn v. Sonman Shaft Coal Company,* 153 Pa. Superior Ct. 76, 33 A. 2d 525 (1943) (brother) ; *Renovich v. Bethlehem Mines Corporation,* 131 Pa. Superior Ct. 351, 200 A. 122 (1938) (grandfather) ; *Mayfield v. Kerr,* 102 Pa. Superior Ct. 532, 157 A. 506 (1931) (uncle) ; and *Dime Trust & Safe Deposit Co. v. Philadelphia & Reading Coal & Iron Co.,* 78 Pa. Superior Ct. 124 (1921) (grandfather of illegitimate child).

In discussing the compensation act in the *Fitzpatrick* case, supra, we pointed out that the question as to whether or not the decedent stood in loco parentis to the claimants within the meaning of the compensation act is largely, although not wholly, one of intention on the part of the person who assumes the obligation, that circumstances and elements other than mere voluntary assumption of support are to be considered and that, while there must be actual and real financial

dependency in compensation cases, it need not be total or exclusive.

In *Kransky v. Glen Alden Coal Co.*, 354 Pa. 425, 47 A. 2d 645 (1946), the Supreme Court clearly indicated that mere financial dependency is not, of itself, sufficient to support a finding that a person stands in loco parentis to another, even though the maintenance furnished is total and exclusive. In reversing a decision awarding compensation to the minor grandchild of a woman with whom the decedent had been maintaining a meretricious relationship, the Supreme Court said: "Aside from the support furnished the child by Kransky . . . there is not a word of testimony and, naturally, no finding that he had ever indicated by word or act any intention on his part to assume the responsibilities of a lawful father to the child. *In loco parentis* is a legal status and proof of essential facts is required to support a conclusion that such a relationship existed. While the support and maintenance of a dependent child is a fact of evidentiary value in determining whether the one furnishing the support stands *in loco parentis* to the child, it is necessary that the evidence as a whole be sufficient to justify a finding that the supporting person intended to assume the *rights, duties and responsibilities* of a lawful parent to the child." 354 Pa. 427-428, 47 A. 2d 646-647.

In *Moritz v. Garnhart*, 7 Watts 302 (1838), Chief Justice GIBSON held that a grandfather, who cared for and maintained the illegitimate minor child of his daughter, could maintain an action in loco parentis for the loss of her services. This ruling was cited with approval by President Judge KELLER in the *Renovich* case, supra.

While it does not appear that any of our decisions expressly sanction finding a relationship in loco parentis between foster parent and foster child, there is nothing in our cases which indicates that such a rela-

tionship could not arise, particularly in a case where the foster parent has assumed or incurred substantial financial obligations in raising the child.

The federal national service life insurance cases also recognize that whether or not the relationship arises is ordinarily a question of fact, to be determined by an evaluation of all of the circumstances, rather than a matter of strict legal definition. The plaintiff relies on the case of *Strauss v. United States,* 160 F. 2d 1017 (C. A. 2d Cir., 1947), cert. den. sub nom. *Goldbaum v. United States,* 331 U. S. 850, 68 S. Ct. 1741 (1947). In the *Strauss* case the court below did not accept the claimant's testimony that she had supplemented the allowance of the welfare agency with funds of her own and the appellate court affirmed a decision against the claimant on the ground that the claimant never undertook or intended to undertake responsibility for the support of the insured. On the other hand in *Lorden v. United States,* 83 F. Supp. 822 (D.C. Mass. 1949), under facts somewhat similar to those in the case before us the court found that the claimant stood in loco parentis to the insured even though the claimant had received some assistance from a welfare agency in raising him. In the *Lorden* case, the court distinguished the *Strauss* decision on the ground that the boy in that case had been furnished nothing but board, while in the case before it the insured was educated, housed, given parental guidance, and treated exactly as the claimant's own son was treated. The *Lorden* opinion expressly rejected the argument that the *Strauss* case held that the receipt of any aid or assistance by a foster parent precluded the establishment of an in loco parentis relationship.

*Leckie v. Locke,* 203 P. 2d 78 (1949), upon which appellee also relies, is likewise distinguishable. In that case the trial court resolved conflicts in the testimony in favor of the plaintiff and awarded her damages

based upon findings that there was no in loco parentis relationship and that the defendants had agreed to save the plaintiff's earnings for her. The appellate court affirmed the judgment on the ground that the trial court's findings were supported by substantial testimony. It did not hold that the defendants' evidence, if believed, was insufficient as a matter of law to establish an in loco parentis relationship.

We conclude that there was evidence in the case before us which, if believed, would support a finding that the defendants stood in loco parentis to the plaintiff, that the court below erred in ruling otherwise as a matter of law, and that its charge as a result was inadequate and prejudicial to the defendants.

The order is reversed and a new trial granted.