480 A.2d 1146

**In re ADOPTION OF CRYSTAL D.R.**

**Appeal of KATHLEEN and Harold R., natural parents.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1983.

Filed July 20, 1984.

Petition for Allowance of Appeal Denied Jan. 7, 1985.

Louis M. Shucker, Reading, for appellants.

John J. Speicher, Reading, for participating party.

Before SPAETH, President Judge, and BROSKY and HOFFMAN, JJ.

SPAETH, President Judge:

This is an appeal from an order terminating appellants' parental rights to their daughter, Crystal. The order was entered on a petition filed by Crystal's foster parents. We hold that with respect to a child entrusted to their care, foster parents have no standing to file a petition for termination of parental rights. We therefore reverse and remand for further proceedings.

Crystal was born August 4, 1974. On August 29, 1975, she was placed with Berks County Children and Youth Services as a dependent child. This was done on a petition filed by the agency. On August 24, 1976, the agency placed Crystal with appellees as foster parents. Appellees have had physical custody of Crystal since that time. The trial court found, and the record shows, that appellees have been "extraordinarily supportive" of Crystal, providing specialized care for certain physical and mental impairments, and

that because of appellees' "care and attention ... Crystal ... has made marked progress physically, mentally and emotionally." Trial court slip op. at 4. On February 18, 1981, appellees filed a petition for termination of appellants' parental rights, and on March 16, 1981, they filed a report of their intention to adopt Crystal. On November 18, 1981, after hearing, the trial court entered a decree nisi terminating appellants' parental rights and awarding appellees custody of Crystal until such time as she was adopted. On June 6, 1983, the court entered an order dismissing appellants' exceptions and making its decree nisi final.

On appeal, appellants make several arguments, but we need consider only their argument that as foster parents, appellees had no standing to petition for termination of parental rights.[1]

§ 2512(a) of the Adoption Act, Act of Oct. 15, 1980, P.L. 934, No. 163, § 1, 23 P.S. §§ 2101 *et seq.*, provides who may file a petition for involuntary termination of parental rights:

(a) Who may file.—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(1) Either parent when termination is sought with respect to the other parent.

(2) An agency.

(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt). 23 P.S. § 2512(a).

Thus, appellees had no standing to file their petition to terminate appellants' parental rights unless they were "individual[s] having custody" of Crystal or "standing in loco parentis"[2] to Crystal.

---

**1.** Appellants' other arguments are, generally stated, that appellees did not meet their burden of proof; that the trial court applied an incorrect standard on burden of proof; and that in certain respects the Adoption Act is unconstitutional.

**2.** As already noted, appellees filed their report of intention to adopt Crystal after they filed their termination petition. However, appel-

(1) Appelles argue that their physical custody of Crystal is "custody(( within § 2512(a)(3). However, "custody" in § 2512(a)(3) refers to legal custody, not merely physical custody. § 2531(a) provides:

> (a) General rule.—Every person now having or hereafter receiving or retaining *custody or physical care* of any child for the purpose or with the intention of adopting a child under the age of 18 years shall report to the court in which the petition for adoption will be filed. (Emphasis added.)

§ 2531(b) provides, in part, that "[w]hen a person receives or retains custody or physical care of a child from an agency the report shall set forth......" It is apparent from these provisions that "custody" in § 2531 means "legal custody", for otherwise the term "physical care" would be surplusage. It follows that "custody" in § 2512 must also mean "legal custody". *American Steel and Wire Company of N.J. v. Unemployment Compensation Board,* 161 Pa.Super. 622, 56 A.2d 288 (1948) (word in one section of statute to be construed to mean same thing in another section of statute).

Appellees also argue that they have "standing in loco parentis" within § 2512(a)(3). This appears to be a question of first impression,[3] and yet we are satisfied that the answer is clear.

█ In *Spells v. Spells,* 250 Pa.Super. 108, 378 A.2d 879 (1977), we said:

lants do not challenge the timeliness of the report of intention to adopt.

3. Appellees claim that in the case of *In Re Adoption of R.I.,* 468 Pa. 287, 361 A.2d 294 (1976), the foster parents had petitioned for termination of parental rights and that "[n]owhere in the opinion was there any equivocation concerning the standing of the foster parents to petition the court to terminate the parental rights of the natural parents." Brief for Appellees at 13. Appellees are mislead, however, because the opinion refers only to the foster parents. The case was on appeal for the second time following remand. When one refers to the original appeal, at 455 Pa. 29, 312 A.2d 601 (1973), it becomes evident that the local agency joined in the petition for involuntary termination of parental rights. *Id.,* 455 Pa. at 30 n. 1, 312 A.2d at 601 n. 1.

Pennsylvania courts recognize that a person may "put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. This status, [known as 'in loco parentis'] embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties." *Commonwealth ex rel. Morgan v. Smith*, 429 Pa. 561, 565, 241 A.2d 531, 533 (1968). "The rights and liabilities arising out of that relation are, as the words imply, exactly the same as between parent and child." *Commonwealth v. Cameron*, 197 Pa.Super. 403, 407, 179 A.2d 270, 272 (1962); *Young v. Hipple*, 273 Pa. 439, 117 A. 185 (1922). *Id.*, 250 Pa.Superior Ct. at 172, 378 A.2d at 881–82.

Plainly, foster parents, because they have physical custody of the child, are concerned with the child's day-to-day needs, and therefore they do discharge many parental duties. However, it does not follow from this fact that they thereby assume a status of in loco parentis to the child, distinguished by "rights and liabilities ... exactly the same as between parent and child." The reason that foster parents have physical custody of the child is that it would be impractical for the agency to care for the child. The agency, while transferring physical custody to the foster parents, remains responsible for the care of the child, and may at any time required by the child's interests regain physical custody and terminate the foster parent's relationship to the child. Thus, 42 Pa. C.S. § 6357 provides:

### § 6357. Rights and duties of legal custodian

A custodian to whom legal custody has been given by the court under this chapter has the right to the physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental, and moral welfare of the child, subject to the conditions and limitations of the order and to the remain-

ing rights and duties of the parents or guardian of the child.

Nevertheless, the trial court held that here the evidence "was more than adequate to establish" that as foster parents, appellees had assumed the status of loco parentis to Crystal. Trial court slip op. at 8. In so holding, the court relied upon this court's decision in *D'Auria v. Lipasky*, 197 Pa.Super. 271, 177 A.2d 133 (1962).

In *D'Auria*, the action was on an alleged agreement to return money. The plaintiff had been the defendants' foster child. After she graduated from high school, at age 18, she did various odd jobs. At age 24, she left the defendants' home and married. She alleged that she had saved some $7,000 at her odd jobs, and had given this money to the defendants upon their agreement to return it to her when she left their home or married. At the trial the defendants asked that the jury be charged that it should determine from the testimony whether they stood in loco parentis to the plaintiff, and be given appropriate instructions regarding the rights of persons standing in loco parentis to receive the earnings of an unemancipated child. The trial judge refused to give such an instruction, reasoning that since the foster parent/foster child relationship was a relationship created by law and under the supervision of the Juvenile Court, no private rights could accrue to foster parents. We reversed and ordered a new trial. We held that "the fact of placement [*i.e.*, the placement of the plaintiff as a foster child with the defendants] is not conclusive .... Although the fact of such placement may weigh against a finding that the defendants stood in loco parentis to the plaintiff, yet the ultimate determination of this question depends upon a consideration of all the facts." *Id.*, 197 Pa.Superior Ct. at 274, 177 A.2d at 134. After examining the testimony, we concluded that "there was evidence in the case ... which, if believed, would support a finding that the defendants stood in loco parentis to the plaintiff," *id.*, 197 Pa.Superior Ct. at 280, 177 A.2d at 137, and that the trial

court should therefore have charged the jury as the defendants had requested.

We acknowledge that at first sight our statement in *D'Auria,* that "the fact of placement is not conclusive" against a finding that foster parents stand in loco parentis to the child, may seem to support the trial court's conclusion that appellees are not precluded by reason of their being foster parents from standing in loco parentis to Crystal. However, general language must always be read in context, and reflection will show that *D'Auria* does not support the trial court's conclusion.

To begin, in *D'Auria* we were not required to construe 23 P.S. § 2512. In 23 P.S. § 2512, the Legislature, in providing who may file a petition to terminate parental rights, said nothing about "foster parents". Instead, it provided only that a petition may be filed by "[e]ither parent"; "[a]n agency"; the individual "having custody", which means, as discussed above, "having legal custody;" and the individual "standing in loco parentis". 23 P.S. § 2512(a). Therefore, the only way to get from *D'Auria* to 23 P.S. § 2512(a) is to reason that in *D'Auria* we used the phrase "standing in loco parentis" in the same way as the Legislature used it in 23 P.S. § 2512(a). That reasoning, however, would represent a *non sequitur.* In *D'Auria* we were examining the relationship between the foster parent and the child. Here, we are examining the relationship between the foster parents and the child's parents. In *D'Auria,* we held that for purposes of asserting a claim against the child, the foster parents may stand in loco parentis to the child. This in no way suggests that for purposes of asserting a claim against the child's parents, the foster parents may stand in loco parentis to the child. To state the matter abstractly: The statement that A may claim against B suggests nothing about whether A may claim against X. Nor is this an oversimplification. For when compared with each other, the relationship between foster parent and child and the relationship between foster parent and child's parents are

just as distinct as the relationship between A and B and the relationship between A and X.

We may therefore put *D'Auria* aside and turn to the problem at hand, which is whether the Legislature meant to include foster parents when it provided in 23 P.S. § 2512(a) that a petition to terminate parental rights could be filed by an individual "standing in loco parentis" to the child. The answer to this question becomes apparent when one considers the structure the Legislature has erected in its effort to protect children and further their wholesome development.

The essential feature of this structure is that it divides responsibility for the child's welfare. In the usual case— and this case represents the usual case—this division of responsibility is among three parties: the child's parents; the agency; and the foster parents. The resulting relationships have been described by the United States Supreme Court in *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), and while the Court was describing the foster care system in New York, it could as well have been describing the foster care system in Pennsylvania. Said the Court:

> The New York system divides parental functions among agency, foster parents and natural parents, and the definitions of the respective roles are often complex and often unclear.[ ] The law transfers "care and custody" to the agency, ... but day-to-day supervision of the child and his activities, and most of the functions ordinarily associated with legal custody, are the responsibility of the foster parent.[ ] Nevertheless, agency supervision of the performance of the foster parents takes forms indicating that the foster parent does not have the full authority of a legal custodian.[ ] Moreover, the natural parent's placement of the child with the agency does not surrender legal guardianship;[ ] the parent retains authority to act with respect to the child in certain circumstances.[20]

[20] "[A]lthough the agency usually obtains legal custody in foster family care, the child still legally 'belongs' to the parents and the

parent retains guardianship. This means that, for some crucial aspects of the child's life, the agency has no authority to act. Only the parent can consent to surgery for the child, or consent to his marriage, or permit his enlistment in the armed forces, or represent him at law." Kadushin, 355. [A. Kadushin, Child Welfare Services (1961)]. *Id.* at 826–28, 97 S.Ct. at 2100–2101 (some footnotes omitted).

We may add some detail to this description as regards "agency supervision of the performance of the foster parents." Before a child may be placed in a foster home, the home must be approved by the agency. 35 Pa.Code § 3130.39; *In Re Lowry*, 317 Pa.Super. 304, 464 A.2d 333 (1983). If their home is approved, the foster parents are paid for providing care for the child. 42 Pa.C.S. § 6306; 62 P.S. § 704.1. The agency supervises the placement, which entails enforcing regulations governing the child's health, § 3700.51, safety, § 3700.67, and discipline, § 3700.63, and in appropriate circumstances the agency may remove the child from the foster home, although the foster parents may appeal the removal, 35 Pa.Code § 3700.73. Finally, the agency is itself under the supervision of the Department of Public Welfare. 62 P.S. § 902; *In Re Lowry, supra.*

Thus, the Legislature has provided that the relationship between the foster parents and the child is by its very nature subordinate both to the relationship between the agency and the child and to the relationship between the child and the child's parents.

We recognize that foster parents generally, and appellees in particular, may find this subordinate status painful. As the Supreme Court pointed out in *Smith v. Organization of Foster Families, supra,* there is an "intrinsic ambiguity" in foster care:

The warmer and more homelike environment of foster care is intended to be its main advantage over institutional child care, yet because in theory foster care is intended to be only temporary, foster parents are urged not [to] become too attached to the child in their care.... Indeed, the New York courts have upheld removal from a foster home for the very reason that the foster parents had become too emotionally involved with the child. *In*

*re Jewish Child Care Ass'n* (Sanders), 5 NY2d 222 [183 N.Y.S.2d 65], 156 NE2d 700 (1959) .... *Id.* at 836, n. 40, 97 S.Ct. at 2105.

*See also,* J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973) at 24 (temporary nature of foster parent/foster child relationship "implies a warning against any deep emotional involvement with the child since under the given insecure circumstances this would be judged as excessive.")

Nevertheless, foster parents may not by pleading their love for the child escape their legal status. For in defining the foster parents' status as subordinate both to the agency's and to the child's parents', the Legislature has in no sense acted arbitrarily. Quite to the contrary, the foster parents' status reflects the Legislature's conviction that if possible, a child should grow up with its parents. When under the Juvenile Act a child is found dependent, the court may transfer to the agency only "temporary legal custody" of the child. 42 Pa. C.S. § 6351(a)(2). The Legislature has recited that the purpose of this limitation is to "preserve the unity of the family whenever possible ...," 42 Pa. C.S. § 6301(b)(1), and further, that this purpose is to be achieved "in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety," 42 Pa.C.S. § 6301(b)(3). It is the foster parents' responsibility to help to achieve these purposes—not to subvert them. When foster parents enter into their relationship with the child, they know that the relationship is temporary; that the agency has the authority to remove the child; and that the parents have the right to visit the child. 55 Pa.Code § 3700.37. In addition, before the placement the agency prepares a family service plan specifying one of the following goals: 1) return of the child to the child's own home; 2) placement in the home of another relative; 3) adoption; 4) placement with legal guardian; 5) independent living; or 6) long-term placement. 35 Pa.Code § 3130.67. So that the plan may be realized, the foster parents must cooperate with both the agency and the

child's parents. In approving a foster home, therefore, the agency must consider, among other factors, the would-be foster parents' ability to cooperate with the agency and to accept the relationship between the child and the child's parents. 35 Pa.Code § 3700.64.

■ We therefore find the conclusion inescapable that the Legislature could not have intended to include foster parents when it provided in 23 P.S. § 2512(a) that an individual "standing in loco parentis to the child" could file a petition to terminate the parental rights of the child. For the relationship between foster parent and child is *not* distinguished by "rights and liabilities ... exactly the same as between parent and child," *Spells v. Spells, supra,* but is a subordinate relationship, supervised by the agency, and in turn by the court, responsible for placing the child. Were we to hold that foster parents could file a petition to terminate parental rights, we should ignore the Legislature's intention. The structure that the Legislature has erected in an effort to ensure that "whenever possible," 42 Pa.C.S. § 6301(b), children will grow up with their parents would be undermined, if not destroyed. Foster parents would be encouraged to become not supporters but rivals of the child's parents. Agencies would be encouraged to neglect or even ignore their responsibilities. As one commentator has observed:

> A foster parent who wanted to adopt would have great incentive to discourage efforts by the parents to retain contact with the child.[251] They might also encourage the child to reject the parents, which can create conflict for the child resulting in emotional harm. In addition, social workers may have less incentive to work with the natural parents, especially if they believe that return home would be detrimental to the child, even if the home were "safe."

[251] If the number of parents wishing to adopt children exceeds the number of children available for adoption, people may become foster parents in the hope of adopting the child.

If one assumes that the great majority of children will return home, then we should favor foster parents who can convey warmth to the child without developing deep attachments which would cause them

to desire to adopt the child. On the other hand, if one assumes that most children will not be returned, then it would be better to place a child with potential adoptive parents in the interest of minimizing the number of moves the child must undergo. Yet this runs the risks discussed in the text. Estimating, at the time of placement, the likelihood of eventual return is difficult and might simply result in self-fulfilling prophecies. The most the system can hope for is foster parents who wish only to be foster parents but who will adopt the child if return becomes impossible. See Gill, [The Foster Care/Adoptive Family: Adoption for Children Not Legally Free, 54 Child Welfare 712 (1975) ]; Goldstein, [Why Foster Care—For Whom For How Long? 30 Psychoanalytic Study of the Child 647 (1975)].

Wald, State Intervention on Behalf of "Neglected Children": Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan L. Rev. 623, 685 (1976).

The present case, indeed, illustrates these very dangers. The foster parents *have* become rivals of the child's parents—to the point of seeking an involuntary termination of the parent's parental rights. And so far as we can determine from the record, the agency *has* neglected its responsibilities. For it has taken no position, at least on the record before us, regarding whether the termination petition should be granted: no one appeared for the agency at the hearing on the petition before the trial court, and the agency has filed no brief with us.

If the system of foster care is to work as intended by the Legislature, the agency may not thus stand by. It is the *agency* that is charged with the responsibility of seeking a permanent home for the child, not the foster parents.[4] To ensure that the agency does not neglect this responsibility, the Department of Public Welfare's regulations provide that the agency must every six months either petition a court to conduct a placement review or conduct an administrative review. The review must:

4. Providing a permanent home for the child does not necessarily exclude foster care. In some circumstances, as, for example, where the child retains strong ties to its parents but the parents are unable to care for the child, long-term foster care may be appropriate. Wald, *supra* at 690, 55 Pa.Code § 3130.72(b)(4); 42 U.S.C.A. § 675(5)(C), Adoption Act of June 17, 1980, P.L. 96–272. Indeed, counsel appointed by the trial court to represent Crystal argues that such placement would be appropriate here. Brief of Child, at 4.

(A) determine the continuing necessity for and appropriateness of the placement;

(B) determine the extent of compliance with the service plan;

(C) determine the extent of progress made toward alleviating the circumstances which necessitated the original placement; and

(D) project a likely date by which the goal for the child might be achieved. 55 Pa.Code § 3130.71(1)(ii).

At the same time that it petitions the court to conduct a placement review, the agency must petition the court to conduct a dispositional review hearing. § 3130.72(a). § 3130.72(b) provides:

(b) A petition for a dispositional review hearing filed by the county agency must request the court to determine whether the child should be:

(1) returned to the parents;

(2) continued in foster care for a specified period;

(3) placed for adoption; or

(4) because of the child's special needs or circumstances, continued in foster care on a permanent or long-term basis.

The purpose of these periodic reviews is to reduce the number of children in placement, § 3130.13, and to "ensure for each child in the Commonwealth a permanent, legally assured family which protects the child from abuse or neglect," § 3130.11. Referring to similar review procedures in New York City, one commentator has observed:

Court review in New York City has ... demonstrated a positive impact on moving children out of foster care. Judicial reviews have been a useful systemic check against agency neglect. Their existence has countered the adage that the longer a child is in care, the more likely he or she will remain in care until the age of majority.

"Periodic Judicial Review of Children in Foster Care" 32 Juvenile & Family Court Journal 61 (1981).

In thus emphasizing the agency's responsibility, we intimate nothing as to whether Crystal should be adopted, or whether some other provision should be made for her future, and if so, what sort of other provision. We only hold that as foster parents, appellees had no standing to petition the trial court to terminate appellants' parental rights. Given that holding, the issue of what sort of provision should be made for Crystal is not before us. On remand, however, it will be the agency's responsibility to determine what provision it believes should be made for Crystal, and then to petition the trial court accordingly.

The order of the trial court terminating appellants' parental rights is reversed, and the case is remanded for further proceedings consistent with this opinion. Meanwhile, legal custody of Crystal is to remain with Berks County Children and Youth Services, and physical custody of her with appellees. Jurisdiction is relinquished.