[No. 7095–6–III.   Division Three.   October 2, 1986.]

*In the Matter of the Welfare of* KEVIN L.

DIANE L. WILHELM, *Appellant,* v. SPOKANE COMMUNITY MENTAL HEALTH CENTER, *Respondent.*

*Mark E. Wilson* and *Dennis C. Cronin* of *University Legal Assistance,* for appellant.

*Lewis M. Wilson, Phoebe E. Powell, Legal Intern,* and *Wilson & Ireland,* for respondent.

MUNSON, J.—This is an appeal of a termination of the mother's parental rights to her minor child; the father was served by publication and did not appear; a default was entered and his parental rights were terminated; his rights are not at issue. We reverse.

At the time these events began, the mother was divorced from the father of Kevin, age 4. The mother has a ninth grade education; she has three children, Kevin being the middle child; she receives public assistance.

Unable to control Kevin, the mother sought assistance from a parent education class and ultimately from Child Protective Services of the Department of Social and Health Services. They, in turn, referred her to the Children's Hospitalization Alternative Program (CHAP).[1] Kevin, who was exhibiting delayed and aggressive behavior, was interviewed by a CHAP caseworker who diagnosed his behavior as a pervasive developmental disorder.[2] The mother then released him into the custody of CHAP which placed him in a foster home for treatment of his deteriorating condition. To continue custody in the foster home beyond 6

---

[1] In 1978, CHAP was created by several private and public agencies in Spokane to provide care for children with developmental and behavioral problems in lieu of institutionalization. For a time it was under the auspices of the Catholic Family Service; later CHAP was transferred to the Spokane Community Mental Health Center.

[2] If not controlled, the disorder leads to a high risk of self-destruction, aggression toward others, uncontrollable screaming and anger, and action without comprehension of any possible consequences.

months, it became necessary to enter an order of dependency for Kevin so he could continue his treatment. The mother appeared at the dependency hearing and indicated she was unable to provide the necessary care; she agreed Kevin would benefit from placement outside the home. RCW 13.34.130(2). Subsequent review hearings were held with the mother being served by mail; she failed to appear thereafter until she received the petition for termination of her parental rights, some 2½ years after Kevin had been placed in the foster home.

Our review indicates the trial court labored long and hard before terminating the parental relationship. This mother did not abandon, abuse, or neglect her child. She was just incapable of dealing with him because of his developmental disorder. Likewise, the record reveals the court reviewed the intent of the Legislature and the law; it clearly articulated its dislike for long–term foster care. There is testimony that: (1) until the petition for termination, the mother's visits were sporadic; (2) after those visits (even after the petition for termination was filed), the child became unmanageable for varying lengths of time; and (3) the mother did not avail herself of the services offered. Perhaps the most telling testimony is that of the mother to the effect she came seeking help and had expected a "new" child returned to her.

On the mother's behalf, counsel raises 20 assignments of error, only one of which we discuss. We decline to examine the other assignments as some were not raised at trial and, therefore, are not properly before this court; the remaining contentions need not be discussed given we reverse the order of termination. Thus, we limit our analysis to the agency's failure to provide the mother with a copy of the plan, and the court's subsequent failure at the initial dependency proceeding to advise her that a dependency determination could, under certain circumstances, result in the termination of her parental rights of Kevin, and the steps she needed to take to avoid such a result.

RCW 13.34.130(2) states:

> Whenever a child is ordered removed from the child's home, the agency charged with his . . . care shall provide the court with a specific plan as to where the child will be placed, what steps will be taken to return the child home, and what actions the agency will take to maintain parent–child ties.
>
> (a) The agency plan shall specify what services the parents will be offered in order to enable them to resume custody and what requirements the parents must meet in order to resume custody.

Here, the court's memorandum decision speaks of such a plan. It appears a plan was filed with the juvenile court and perhaps maintained in that court's social file relative to Kevin. The fourth supplement to the clerk's papers submitted to this court contains an agency plan dated January 24, 1983. The first dependency hearing was held January 31, 1983. The clerk's papers show the filing stamp on the plan is whited out. However, reading the back of that page, it may be deduced the plan was filed with the Superior Court on January 2, 1986; the termination proceeding was held January 7 and 8, 1985. There is no filing stamp on the plan evidencing its filing with the juvenile court; nor is there any evidence or testimony indicating such a plan was provided to this mother.

██ Inherent in the statutory requirement that the agency file a plan with the court is the requirement that the plan also be served on the parents if their whereabouts are known. The court at the dependency hearing must discuss the plan with the parents, if present, so they are able to understand the contemplated steps to be taken regarding their dependent child, and the importance of their participation in that program.

Here, it is obvious that everyone at the initial dependency hearing was concerned with helping Kevin because of his emotional instability and delayed development. However, given this focus, it is likewise apparent that the participation of the mother in this process was not addressed. Although such a plan is necessarily general in scope, providing the mother with the plan would have emphasized

the subsequent instructions given by caseworkers and medical personnel with respect to her role in learning how to live with Kevin. Without reference to such a plan or the court's solemn advice, the people helping Kevin were unable to make the mother understand the necessity of her participation in her son's treatment; she simply expected them to "wave the magic wand" and return to her a normal son without any input on her part. This expectation was totally unrealistic, but given her background, her care of two other children, and considering she was neither neglectful, abusive, nor abandoning Kevin, we conclude it was necessary to provide her with a copy of the plan.

Future review hearings were clearly anticipated as Kevin was in a long–term treatment program; he was placed in a foster home with foster parents who had been given special education in handling these types of children, and had, in fact, previously adopted one such child. However, our review reveals no indication the mother was advised at the original dependency hearing that her continued presence was recommended at subsequent review hearings. Nor was she advised that her lack of such participation could contribute to the termination of her parental rights. Having attended the first hearing where she agreed to the necessity of treatment, she likely believed her presence was unnecessary, and perhaps even unwelcome, at subsequent review hearings as her visitations not only confirmed, but accelerated Kevin's continuing disturbed condition. Further, the orders entered after the review hearings appear routine in their appraisal of the situation. While noting the mother's reluctance to visit her son, there were no reasons given for this reluctance nor solutions suggested to improve the visitations. Parenting classes were suggested as well as individual and parent–child therapy, yet the review board on January 12, 1984, stated the agency was satisfied with the cooperation of the parent "given her circumstances." We have no concept of what that means.

Although we recognize the dependency caseload of the juvenile court system is overwhelming and caseworkers are

frequently frustrated by a parent's seeming lack of involvement, we are also cognizant of the strict legislative and due process requirements imposed to insure the fairness of termination proceedings. *In re Luscier,* 84 Wn.2d 135, 524 P.2d 906 (1974).

The judgment is reversed.

GREEN, C.J., concurs.

MCINTURFF, J. (concurring specially)—Two issues raised by Ms. Wilhelm were not discussed in the unanimous opinion because they were not essential for the disposition of this case. However, should either party seek further review, I would urge that the Supreme Court address these questions, for they present two problems of constitutional magnitude impacting the disposition of termination cases in this state. The issues relate to (1) a knowing and intelligent waiver of the right to an attorney, and (2) the standing of private agencies and individuals to file petitions for termination.

I note that neither of these issues was raised at the trial court level. However, the waiver issue presents a problem of constitutional magnitude, so may be considered for the first time on appeal. RAP 2.5(a). Although the issue of standing is waived if not presented to the trial court, *Baker v. Baker,* 91 Wn.2d 482, 484, 588 P.2d 1164 (1979), counsel for Children's Hospitalization Alternative Program (CHAP) agreed to waive his objection to appellate review during oral argument. Based on his stipulation and the premise this court may rule on an issue of fundamental justice, *Peoples Nat'l Bank v. Peterson,* 82 Wn.2d 822, 830, 514 P.2d 159 (1973); *State v. Gann,* 36 Wn. App. 516, 522, 675 P.2d 1261 (1984), I address these contentions.

## KNOWING AND INTELLIGENT WAIVER

Ms. Wilhelm also argues she did not make a knowing and intelligent waiver of her right to an attorney. While it is clear she was entitled to an attorney and that the court had

a responsibility to appoint one for her, RCW 13.34.090,[3] JuCR 3.4(b), it has not been decided whether parents must make a knowing and intelligent waiver of their right to counsel under the standards found in criminal law cases. *See Bellevue v. Acrey,* 103 Wn.2d 203, 691 P.2d 957 (1984); *State v. Christensen,* 40 Wn. App. 290, 292, 698 P.2d 1069 (1985). While a termination action does not result in a loss of personal freedom, parental rights are a liberty interest, and "'more precious to many people than the right to life itself.'" *In re Luscier,* 84 Wn.2d 135, 136–37, 524 P.2d 906 (1974). Not only is the parent entitled to be represented by an attorney, but the representation must be effective. *In re Moseley,* 34 Wn. App. 179, 184, 660 P.2d 315 (1983). At least with respect to a termination hearing, the courts will closely scrutinize the record to assure that parents have been accorded the procedural fairness required by due process of law. *Luscier,* at 137.

The liberty interest in a criminal case has been distinguished from the liberty interest of parental rights in *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153, *reh'g denied,* 453 U.S. 927 (1981). There, Justice Stewart concluded an indigent litigant has an absolute right to appointed counsel only when he may be deprived of his physical liberty. In termination cases, the right to appointed counsel must be decided on a case–by–case basis after balancing several factors against the precedent noted above. Those factors include (1) the private interest at stake, (2) the government's interest, and (3) the risk that the procedures used will lead to an erroneous

---

[3]RCW 13.34.090 provides:

"Inherent rights under chapter proceedings. Any party has a right to be represented by an attorney in all proceedings under this chapter, to introduce evidence, to be heard in his or her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing, and to an unbiased fact-finder.

"At all stages of a proceeding in which a child is alleged to be dependent pursuant to RCW 13.34.030(2), the child's parent or guardian has the right to be represented by counsel, and if indigent, to have counsel appointed for him or her by the court."

decision. *Lassiter,* 452 U.S. at 28. In 452 U.S. at 33–34, however, Justice Stewart noted:

> A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution. Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well. Most significantly, 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases. The Court's opinion today in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise.

(Citations omitted.)

In this case, Ms. Wilhelm's lack of knowledge and appreciation for her plight is apparent from the record. She did not participate in the numerous review hearings; it was only after the termination petition was filed that she became active in regular visits with her son and attended parenting classes. Coincidentally, the visits began after Ms. Wilhelm asked for and was given an attorney. Recognizing the fact the grounds for proving termination are established during the dependency, I conclude it is imperative that parents who voluntarily waive their right to an attorney do so knowingly and intelligently and that the juvenile court has a strict obligation to inform the parents of the risk of self–representation, adopting and adapting the suggestions outlined in *State v. Christensen, supra* at 295.

## STANDING

Ms. Wilhelm argues CHAP does not have standing to commence an action for termination of parental rights. Here, CHAP filed the petition to terminate and was represented during the proceeding by a private attorney. CHAP argues it is currently under contract to the Department of Social and Health Services (DSHS) to provide foster care for children with behavioral problems and among the services listed in the contract is termination proceedings. It

argues further it is implicit by reference to RCW 13.34.040 that "any person" may file a dependency petition as well as a termination action. I disagree with this rationale for two reasons: (1) the doctrine of parens patriae is necessarily a public function which can only be performed by the State, (2) pursuant to parens patriae and statutory authority, the State is a necessary party to termination actions.

An extensive review of the origin of authority which allows the State to interfere in the familial relationship is found in *Weber v. Doust,* 84 Wash. 330, 146 P. 623 (1915) and in *In re Hudson,* 13 Wn.2d 673, 697, 126 P.2d 765 (1942). *Weber,* at 333–34 states:

> Upon the abolition of the court of wards in England, the care of infants fell to the King and was exercised through the court of chancery, as will be seen by reference to the authorities hereinafter cited. The care and protection of infants was a prerogative of the crown. 3 Blackstone, Commentaries, 427.
>
> "When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them except so far as they have delegated a portion of it to the Federal government. The sovereign will is made known to us by legislative enactment. The state, as a sovereign, is the *parens patriae.*" *Fontain v. Ravenel,* 17 How. 369, 384.
>
> "This prerogative of *parens patriae* is inherent in the supreme power of every state, whether that power is lodged in a royal person or in the legislature, and has no affinity to those arbitrary powers which are sometimes exerted by irresponsible monarchs to the great detriment of the people and the destruction of their liberties. On the contrary, it is a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves. Lord Chancellor Somers, in *Cary v. Bertie,* 2 Vernon, 333, 342, said: 'It is true infants are always favored. In this court there are several things which belong to the King as *pater patriae* and fall under the care and direction of this court, as charities, infants, idiots, lunatics, etc.'" *Romney v. United States,* 136 U. S. 1 [, 34 L. Ed. 478, 10 S. Ct. 792 (1890)].
>
> The right of the state to exercise guardianship over a

child does not depend on a statute asserting that power. Such statutes are only declaratory of the power already and always possessed by courts of chancery, and they will even now exercise that power concurrently or in aid of a statute. *In re Sall,* 59 Wash. 539, 110 Pac. 32, 626, 140 Am. St. 885 [(1910)]; *Johnson v. McNabb,* 7 Ind. App. 393, 34 N. E. 667 [(1893)].

In *Hudson,* at 696–97, our court stated:

> The underlying reason for the creation of juvenile courts was to take in hand by the state, as a protector and guardian, the child who had commenced to go wrong, because either the unwillingness or inability of the natural parents to guide that child compelled the intervention of the state.
>
> . . . If the parents are found to be unfit or unable to retain or provide for the care of a child, the juvenile court may commit that child to the control of the appropriate *public* officers or to a *public* institution recognized by the state.

(Italics mine.)

Parens patriae literally means "father of the country" and refers to the role of the *state* as guardian of persons with legal disabilities such as minors or those mentally incompetent. *Chandler v. Chandler,* 56 Wn.2d 399, 404, 353 P.2d 417 (1960); *In re Eberhardy,* 97 Wis. 2d 654, 294 N.W.2d 540, 543 (1980); *Wentzel v. Montgomery Gen. Hosp., Inc.,* 293 Md. 685, 447 A.2d 1244, 1253 (1982), *cert. denied,* 459 U.S. 1147, 74 L. Ed. 2d 995, 103 S. Ct. 790 (1983); *Commonwealth ex rel. Bellotti v. Russell Stover Candies, Inc.,* 541 F. Supp. 143, 144 (D. Mass. 1982). This common law authority has been incorporated into our statutory scheme at RCW 13.34. Under the dependency provision, "any person" may file a petition with the superior court to institute such a proceeding. RCW 13.34.040. The termination section is less clear; it states: "A petition seeking termination of a parent and child relationship may be filed in juvenile court. Such petition shall conform to the requirements of RCW 13.34.040 as now or hereafter amended . . ." RCW 13.34.180. Thus, through reference to RCW 13.34.040, there is some basis for arguing a termina-

tion action may be filed by "any person". As noted by CHAP, this interpretation would be in conformity with five other states which have specifically delegated their parens patriae power to foster care agencies. *See* Or. Rev. Stat. § 419.52(3);[4] Neb. Rev. Stat. § 43–285; N.H. Rev. Stat. § 170–C:4; Va. Code. § 16.1–281B; N.C. Gen. Stat. § 7A.289-.24(3).

The applicable juvenile court rules do not provide any guidance, *see* JuCR 4.2.[5] As noted in the author's comments, 4A L. Orland, Wash. Prac. § 7011, at 399 (3d ed. 1983): "Neither the statute nor the Juvenile Court Rules specify the party who may properly file the petition. This matter is left for development through case law."

Other jurisdictions have answered the question of standing with respect to foster parents who file petitions to terminate, *see L.S.J. v. E.B.,* 672 S.W.2d 937 (Ky. Ct. App. 1984) (foster parents lacked standing); *In re Crystal D.R.,* 331 Pa. Super. 501, 480 A.2d 1146 (1984) (foster parents had no standing to file petition to terminate as party "standing in loco parentis"), and custodial parents who file against the noncustodial parent, *see Ex parte Johnson,* 474 So. 2d 715, 718 (Ala. 1985) (which interpreted Alabama statute expressly giving parent the right to file); *Davis v. Davis,* 708 P.2d 1102 (Okla. 1985) (which held the mother was prohibited from seeking termination of the father's rights to his minor daughter).

Regarding the right of foster parents to seek termination,

---

[4] My review of the Oregon statutes discloses no provisions under the citation given above. Neither is there any specific provision in the termination section. *See* Or. Rev. Stat. § 419.525, regarding who may file a petition to terminate.

[5] JuCR 4.2(a) provides:

"A petition requesting the termination of a parent–child relationship may be filed in the juvenile court. The petition shall conform to the requirements of rule 3.3, shall be verified, and shall state the facts which underlie each of the allegations required by RCW 13.34.180."

JuCR 3.3 does not address the question of who may file the petition; that question is answered in JuCR 3.2 which states: "Any person may file a petition alleging dependency."

the rationale expressed in *L.S.J.,* at 940 is pertinent:

> It is our observation that the cabinet, once the foster parents demonstrated aggressive interest and commenced litigation, abandoned its duty and obligation to L.S.J. and her daughter by failing to fulfill its duties as set out in its own regulations. It is apparent to us that once the foster parents were committed to the course of keeping A.R.S., the cabinet cut L.S.J. adrift in a sea of very choppy waters. As we glean from the statutes and regulations, the primary duty and function of the cabinet and its staff is to attempt an upgrading of familial relationships, to strive to keep together parents and children who are committed to their charge, and to offer all support reasonable to that end. *See* 905 KAR 1:005 *et seq.*

The opinion of the Kentucky court is similar to the reasoning found in *In re Coverdell,* 39 Wn. App. 887, 696 P.2d 1241 (1984), which held a foster parent has no right to intervene as a party in a dependency proceeding. Thus, there is a basis for concluding foster parents do not have standing to file a petition to terminate.

The question of an interparental proceeding was more aptly answered in *Davis,* at 1105, which held the juvenile code authorized the *state* to intervene where there is evidence of abuse and neglect and that custody disputes between parents should be handled on the civil, rather than the juvenile, court docket. Thus, there are grounds for excluding parents from filing a petition to terminate. Based on the reasoning above, I conclude there is sufficient justification to argue not "any person" is authorized to commence a termination action; rather, there are two distinct classes of persons who should be excluded: foster parents and natural custodial parents.

CHAP additionally argues its authority to petition for termination from a contractual agreement with DSHS. A clause of that agreement states: "when indicated, permanent planning services include . . . termination of parental rights." The source of a state agency's rights, powers, duties, privileges and immunities is statutory. *State Liquor Control Bd. v. State Personnel Bd.,* 88 Wn.2d 368, 371, 561

P.2d 195 (1977); *State ex rel. Graham v. San Juan Cy.*, 102 Wn.2d 311, 313–14, 686 P.2d 1073 (1984). CHAP has not identified the authority under which the State can delegate its responsibility as parens patriae to bring termination actions. Even if one assumes, arguendo, the State can delegate this quintessentially public function to a private agency, I would conclude CHAP does not have the requisite legal or equitable right required to pursue the issue. As stated in *DeFunis v. Odegaard,* 82 Wn.2d 11, 24, 507 P.2d 1169 (1973), *vacated on other grounds in* 416 U.S. 312, 40 L. Ed. 2d 164, 94 S. Ct. 1704 (1974):

> As noted by the United States Supreme Court in *Flast v. Cohen,* 392 U.S. 83, 99, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968):
>> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204 [7 L. Ed. 2d 663, 82 S. Ct. 691] (1962).

CHAP does not have legal custody of Kevin; as a dependent child, legal custody resides with the State, specifically the Department of Social and Health Services. Nor is there a statutory exception granting standing to private agencies to be a party to a termination action. Analogous to termination actions is the ruling found in *Casebere v. Clark Cy. Civil Serv. Comm'n,* 21 Wn. App. 73, 76, 584 P.2d 416 (1978), which held that merely because a citizen is entitled to petition for an investigation of civil service irregularities, he is not entitled to be a party to court review of the irregularities. I would conclude CHAP's interest in Kevin is one shared with citizens in general and thus it has no standing to pursue the termination in court as a party to the action. *Casebere,* at 76 (citing *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 41 L. Ed. 2d 706, 94 S. Ct. 2925 (1974)).

Finally, I would conclude the State is one of three neces-

sary parties to a termination action; the other two are the parents and the child. *In re D.*, 24 Or. App. 601, 547 P.2d 175, 179, *cert. denied,* 429 U.S. 907 (1976). It is the State which will ultimately be awarded legal custody should termination be required. It is the State, through the juvenile court, which will arrange for placement of the child or adoption, and approve or disapprove medical treatment, out–of–state travel, marriage under 18 and all the other responsibilities associated with parental authority. CHAP's role is to recommend and provide the necessary medical treatment after obtaining court approval. Thus, CHAP does not have the requisite legal interest to confer standing.