J-S35016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.M.T., JR., AND N.C.T., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.T., GRANDMOTHER | No. 2972 EDA 2014 |

Appeal from the Order entered August 13, 2014,
in the Court of Common Pleas of Philadelphia County, Domestic
Relations, at No(s): CP-51-AP-0000145-2012,
CP-51-AP-0000146-2012

BEFORE:  MUNDY, OLSON, and PLATT*, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED JULY 13, 2015**

Appellant, D.T., ("Paternal Grandmother") appeals from the order dated and entered on August 13, 2014, granting the petitions for adoption filed by Y.C., the foster mother ("Foster Mother") of T.M.T., Jr., a male born August of 2007, and N.C.T., a female born in June of 2009 (collectively, the "Children"), and denying the petitions for adoption filed by Paternal Grandmother, under the Adoption Act, 23 Pa.C.S.A. §§ 2701-2742.[1]  We affirm.

On July 20, 2012, the trial court granted the petitions to involuntarily terminate the parental rights of the Children's mother, J.J., ("Mother"), and

---

* Retired Senior Judge specially assigned to the Superior Court.

[1] The trial court's orders serve as its adoption decree, as the court granted Foster Mother's petitions for adoption of the Children.  We will not remand this matter for the entry of an adoption decree.

father, T.M.T., Sr., ("Father"), filed by the Philadelphia Department of Human Services ("DHS").

On July 31, 2012, Paternal Grandmother filed petitions for adoption of the Children.[2] The trial court scheduled a finalization hearing to take place on October 12, 2012. On August 8, 2012, the trial court canceled the scheduled hearing, however. On April 8, 2013, this Court affirmed the order terminating Father's parental rights. *In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013). On August 9, 2013, Paternal Grandmother filed certificates of service for her petitions for adoption.

On April 15, 2014, Foster Mother filed petitions for adoption of the Children, along with reports of intention to adopt, and reports of intermediary for each child. On July 14, 2014, the trial court held a hearing on the competing adoption petitions.

At the adoption hearing, both Paternal Grandmother and Foster Mother were present, represented by counsel, and testified on their own behalf. DHS presented the testimony of Audrina Redguard, the ongoing service worker at DHS. N.T., 7/14/14, at 22-23. DHS also presented the testimony of Benita Riley, the DHS adoption social worker. **Id.** at 47.

Paternal Grandmother testified that she began raising the Children in 2009, when they were removed from the care of their biological parents

---

[2] As the blood-related grandmother of the Children, Paternal Grandmother was exempted from filing a report of intention to adopt and a report of intermediary. **See** 23 Pa.C.S.A. §§ 2531(c) and 2533(a).

because of unsafe housing. N.T., 7/14/14, at 4, 6. She is currently employed by the City of Philadelphia, and previously was employed with the school district, working with children. *Id.* at 5. Paternal Grandmother testified that she has no record of committing child abuse. *Id.* at 5. Paternal Grandmother stated that the Children lived with her, and that she took sole responsibility for caring for them. *Id.* at 7. She testified that, at times, Father or her sister, R., assisted her in caring for the Children. *Id.* at 7.

Paternal Grandmother explained that the Children were under DHS supervision while they lived with her. *Id.* at 8. She stated that a social worker, Ms. Noelle, would come to her home on a weekly basis, and Ms. Redguard would come to her home once a month. *Id.* Paternal Grandmother testified that she did not receive any negative feedback from the DHS supervisors while the Children lived with her, and that they indicated everything was fine. *Id.*

Paternal Grandmother stated that, on one occasion, Ms. Redguard told her that Mother was complaining about the appearance of the Children's clothes, and, another time, Ms. Redguard told her to get the Children to the doctor sooner. *Id.* at 8-9. Paternal Grandmother testified that she, Father, or her brother would take the Children to their supervised and unsupervised visits with Mother. *Id.* at 9-10. Paternal Grandmother stated that, when Father and her brother began taking the Children to visits with Mother,

Mother began complaining about the appearance of the Children. *Id.* at 10. Paternal Grandmother testified that she had taken the Children to the doctor six or seven days prior to their removal from her care on July 8, 2011. *Id.*

Paternal Grandmother testified that Ms. Redguard visited her on July 6, 2011, informed her of a status review hearing scheduled for the following day, at which Paternal Grandmother need not be present. *Id.* at 10, 12. Paternal Grandmother stated that Ms. Redguard observed the Children sitting at a table and eating, and did not complain about their appearance. *Id.* at 11. Paternal Grandmother testified that Ms. Redguard told her that she would ask the court to grant Paternal Grandmother permanent legal custody at the hearing. *Id.*

Paternal Grandmother stated that she did not attend the hearing on July 7, 2011, because she had a staff development meeting at work. *Id.* at 10-11.[3] Paternal Grandmother testified that Ms. Redguard came to her home after the hearing on July 7, 2011, and informed her that Mother brought photographs depicting something spilled on the floor, which came as a surprise to Ms. Redguard and Ms. Noelle. *Id.* at 12. Paternal Grandmother testified that Ms. Redguard stated she and Ms. Noelle would be removing the Children. *Id.* Paternal Grandmother explained that Ms. Redguard showed her a photograph that depicted spaghetti sauce spilled on the floor, and the appearance of vomit on the floor, but Paternal

---

[3] The trial court admitted as evidence the notes of testimony from the hearing on July 7, 2011. *Id.* at 22-23.

Grandmother denied that anyone in her home ate spaghetti. *Id.* at 13. Paternal Grandmother told the Children that they were being removed and needed to cooperate, which upset them and made them cry. *Id.* at 12-13. Paternal Grandmother is seeking to adopt the Children because they are her family. *Id.*

Paternal Grandmother testified that, after the Children were removed from her care, N.C.T. sustained a concussion, and Paternal Grandmother and Father went to the hospital to see her. *Id.* at 16. Paternal Grandmother explained that, after the Children were removed from her care, she was permitted to visit them, and did visit them, at the Children's Services, Inc. ("CSI") building for approximately one month, but stopped because of her work. *Id.* Paternal Grandmother testified that she has a close, loving family, and teaches giving, caring, and loving each other. *Id.* Paternal Grandmother takes the children in her family to family gatherings and playgrounds. *Id.* at 20. Paternal Grandmother believes it is in the best interest of the Children for her to adopt them because she kept them healthy, has fun with them, and loves them. *Id.*

Ms. Redguard testified that, as an ongoing service worker at DHS, it is her responsibility to make certain that children are safe after intake until adoption. *Id.* at 23-24. She became responsible for this case in 2010. *Id.* at 24. Ms. Redguard testified that, prior to July 7, 2011, a former CSI worker brought to her attention that Paternal Grandmother failed to follow-

up on the ophthalmology appointments for T.M.T., Jr. **Id.** at 24, 26. The former CSI worker, Ms. Noelle, brought to her attention that Mother was complaining about the Children's appearance at visits. **Id.** at 24-25. Additionally, CSI was concerned that Father was bringing the Children to visit Mother, as the parents had a contentious relationship. **Id.** at 25-26. Paternal Grandmother, as the kinship care parent, was expected to bring the Children to the visits. **Id.** at 25.

Ms. Redguard explained that DHS subcontracted CSI to provide services. **Id.** at 26. CSI was responsible for the supervised visits at CSI, and for conducting weekly visits with Paternal Grandmother to ensure that the Children were safe while in her care. **Id.** Ms. Redguard testified that CSI sent a letter, dated June 20, 2011, to Paternal Grandmother at her address, and copied DHS. **Id.** at 27-28. In the letter, CSI stated concerns about the Children's unwashed appearance and their musty body odor. **Id.** at 28. Further, in the letter, CSI stated that, if the hygiene and personal care issues continued to be an issue, the Children would be removed from the home. **Id.**

Ms. Redguard testified that, in February or March of 2011, she had a conversation with Paternal Grandmother concerning the need to ensure that T.M.T., Jr. was taken to medical appointments, about Father bringing the Children to their visits with Mother, and the appearance of the Children. **Id.** at 30. Ms. Redguard stated that, when she went to the home once a month,

the Children appeared to be happy and thriving, and they were eating. *Id.* at 30-31. However, there were concerns about the Children's appearance and body odor when they left the home. *Id.*

On the morning of the status hearing on July 7, 2011, Mother showed Ms. Redguard twelve photographs that depicted the Children with bite marks on their bodies. *Id.* at 31-33. The photographs alarmed Ms. Redguard, because she saw the Children at Paternal Grandmother's home on the day prior the hearing, but they were dressed with clothing that covered their backs and arms. *Id.* at 32-33. After the hearing, Ms. Redguard proceeded to Paternal Grandmother's home, showed Paternal Grandmother one of the photographs, and explained that the Children were being removed from Paternal Grandmother's care. *Id.* at 34-35. Paternal Grandmother stated that the marks were mosquito bites. *Id.* at 32, 36. Paternal Grandmother packed the Children's belongings in two trash bags, which they took to the foster care home. *Id.* at 35.

When Ms. Redguard arrived with the Children at their foster care home, she examined both of the Children. *Id.* She found that N.C.T. had bruises or some type of marks on her back and her arms, consistent with the photographs, some of which had cleared up. *Id.* The bruises were on N.C.T.'s upper back, arm, and under both eyes. *Id.* at 35-36. She also had scratches on her face. *Id.* Ms. Redguard later discovered the marks on both Children were scabies bites. *Id.* at 36. Ms. Redguard further testified

that she examined T.M.T., Jr. without his clothing. *Id.* at 37. He did not have as many bite marks as N.C.T., but he was wearing blue plastic underpants. *Id.* T.M.T., Jr, explained that Paternal Grandmother dressed him in the blue plastic underwear when he urinated in his underwear. *Id.* Ms. Redguard was concerned as the temperature was 90 degrees Fahrenheit and she was uncertain as to how long T.M.T., Jr. had been wearing the blue plastic underpants after he soiled his pants. *Id.* Ms. Redguard stated that T.M.T., Jr. had been properly bathed, for the most part, but N.C.T. was filthy around her neck. *Id.* at 38.

Ms. Redguard testified that, prior to July 7, 2011, Mother had one or two one-hour visits with the Children at CSI. *Id.* at 38. At the time of the July 7, 2011 hearing, Mother had one other child living with her. *Id.* DHS had no concerns about that child, who was approximately one year old, and did not have scabies. *Id.* After the Children were removed from Paternal Grandmother's care, Foster Mother took the Children to the pediatrician, where they received treatment for their scabies. *Id.* at 39. Ms. Redguard remained involved with the case until July or August of 2012. *Id.* at 39. She is unaware of the Children having scabies between July of 2011 and July of 2012, and she had no other concerns about the Children after their removal from Paternal Grandmother's home. *Id.*

On cross-examination by counsel for Foster Mother, Ms. Redguard testified that she had a conversation with Paternal Grandmother about the

two ophthalmology appointments which T.M.T., Jr. missed. *Id.* at 40. She explained to Paternal Grandmother that the ophthalmology appointments were important so that T.M.T., Jr.'s vision could be monitored.[4] *Id.* at 40-41.

On cross-examination by counsel for Paternal Grandmother, Ms. Redguard testified that she received a medical document regarding the Children's scabies. *Id.* at 41-42. She believed that T.M.T., Jr. would have been three years old and would have had pediatrician appointments once a year, while N.C.T. would have been under two years old and would have been seen by a physician every six months. *Id.* at 42. Ms. Redguard told Paternal Grandmother about the missed ophthalmology appointments and Father taking the Children to CSI for visits with Mother, but she did not know about the scabies bites during her visits. *Id.* at 43. When she saw the Children prior to the status hearing on July 7, 2011, they seemed fine, and she told Paternal Grandmother that she would request the court to award Paternal Grandmother permanent legal custodianship of the Children. *Id.* at 43.

Ms. Redguard was assigned to the case for approximately two years and, when she visited the home of Paternal Grandmother on a monthly basis, the residence seemed to be a fine home for the Children. *Id.* at 42-43. Ms. Redguard told Paternal Grandmother that she was not required

---

[4] T.M.T., Jr. suffers from congenital glaucoma and is blind in one eye. If left unchecked, the condition could lead to total blindness.

to be present at the status hearing scheduled for July 7, 2011, but she was welcome to attend. *Id.* at 43-44. Ms. Redguard explained that Mother presented the photographs at the status hearing, but did not testify under oath. *Id.* at 44. The July 7, 2011 status hearing was the first hearing that Mother attended. *Id.* at 45-46.

Ms. Redguard was concerned about Father transporting the Children to their visits with Mother because the parents had a contentious relationship. *Id.* at 45. The Children were removed from Mother's custody because of the deplorable living conditions in her home, including a lack of utilities, holes in the ceiling, and decay causing unsafe conditions. *Id.* at 46. Ms. Redguard also took the Children to their foster care home on July 7, 2011. *Id.*

On cross-examination by the Child Advocate's counsel, Ms. Redguard testified that she harbored a concern about Father transporting the Children to their visits with Mother because he has drug and alcohol issues. *Id.* The court terminated Father's parental rights to the Children because he never remedied those issues. *Id.* Nevertheless, Paternal Grandmother allowed Father to transport the Children. *Id.* at 46-47.

Next, DHS presented the testimony of Ms. Riley, who became responsible for the case in August of 2012, after it was transferred to the adoption unit of DHS. *Id.* at 47. She was responsible for ensuring that the Children were in a safe environment and that the adoption papers were timely processed. *Id.* at 47-48. Ms. Riley testified that the Children were

currently in the pre-adoptive Delta Community support home of Foster Mother, where they lived since February 1, 2013. *Id.* at 48. She visited the Children on a monthly basis from the time of placement in the home until March of 2014, for thirteen visits. *Id.* Her visits lasted for forty-five minutes to an hour. *Id.* at 48-49.

Ms. Riley testified that T.M.T., Jr. has a happy, healthy, content relationship with Foster Mother and moves freely in her home. *Id.* at 49. He seeks out Foster Mother for comfort. *Id.* Ms. Riley opined that there is a bond between T.M.T., Jr. and Foster Mother. *Id.* She is aware that he has congenital glaucoma, is blind in his left eye, and receives ophthalmology services through Children's Hospital of Philadelphia. *Id.* T.M.T., Jr. receives bi-weekly counseling to address his aggression and receives medications for that condition. *Id.*

Ms. Riley testified that Foster Mother is consistently aware of the Children's appointments and the services they are receiving. *Id.* at 50. Ms. Riley considers Foster Mother capable of caring for T.M.T., Jr.'s medical and behavioral needs. *Id.* Ms. Riley observed that Foster Mother is nurturing toward T.M.T., Jr., re-directs him as necessary, is loving and attentive toward him, and ensures that all of his needs are met. *Id.* Ms. Riley testified that, on behalf of DHS, she consented to Foster Mother's petition to adopt T.M.T., Jr. because the Children seem bonded to Foster Mother, Foster Mother addresses their needs, and she requested to adopt them. *Id.* at 50-

51. Ms. Riley believes it is in T.M.T., Jr.'s best interest for Foster Mother to adopt him, and that it is contrary to his best interest to be adopted by anyone else. *Id.* at 51.

Ms. Riley observed that N.C.T. is younger and more "needy" than T.M.T., Jr. *Id.* N.C.T. interrupts Ms. Riley's conversations with Foster Mother, but Foster Mother re-directs her. *Id.* Foster Mother is nurturing toward N.C.T., and ensures that all of N.C.T.'s needs are met, including enrolling her in pre-school. *Id.* N.C.T. receives preventative ophthalmology appointments and receives preventative medication for the glaucoma condition, for which she has not been diagnosed. *Id.* at 51-52. Foster Mother ensures that N.C.T. attends her medical appointments and takes her medicine. *Id.* at 52. Foster Mother had N.C.T. evaluated a few months prior to the July 14, 2014 hearing. *Id.* The evaluation recommended that no services were necessary for N.C.T. *Id.*

Ms. Riley described Foster Mother's interactions with N.C.T. as loving, kind, and attentive. *Id.* Ms. Riley explained that DHS consented to Foster Mother's adoption of N.C.T. because Foster Mother has been a stable provider for both of the Children. *Id.* at 53. Foster Mother ensures that the Children are safe, and that their medical, educational, and daily needs are met. *Id.* Ms. Riley believes that it is in N.C.T.'s best interest to be adopted by Foster Mother. *Id.*

On cross-examination by counsel for Foster Mother, Ms. Riley responded that she believes Foster Mother will be able to maintain the Children's services and keep up with their medical appointments. *Id.* Ms. Riley stated that she understands the importance of continuing the Children's medical care and meeting T.M.T., Jr.'s behavioral and emotional needs. *Id.*

Finally, Foster Mother testified that she has lived at her current address for thirteen years, and plans to continue residing there. *Id.* at 54. Foster Mother stated that she has biological children, a male who is 35 years old and has three children and a daughter who is 26 years old and is a nurse, and has two children. *Id.* at 54-56. Neither of these grown children resides with her, but her daughter brings her children to Foster Mother's home to play with N.C.T. *Id.* Foster Mother also has a 22-year-old biological daughter, who resides at home and is studying to be a licensed practical nurse. *Id.* at 54-55. Foster Mother's younger daughter helps her with feeding and watching the Children. *Id.* at 55. Foster Mother also can depend on her friends and family. *Id.* Foster Mother has had more than forty children in her home, and she treats them all as family. *Id.* In 2008, Foster Mother adopted two children who are brothers, one of whom has autism and mild retardation, which she has to manage. *Id.* Foster Mother also has permanent legal custody of a third male child, who has been living with her since 2010. *Id.*

Foster Mother testified that, at first, T.M.T., Jr. was leery of her home, but now realizes that he is part of a family and enjoys interacting with the older boys. *Id.* The older boys help watch N.C.T. *Id.* at 57. Foster Mother stated that she wants to adopt the Children because she loves them and they are part of her family. *Id.*

Foster Mother ensures that T.M.T., Jr. receives his eye drops and medication before he eats in the morning. *Id.* at 58. She stated that T.M.T., Jr.'s ophthalmologist believes the child's eye is stable and that it will not worsen. *Id.* She also ensures that T.M.T., Jr. sees his behavioral therapist every two weeks. *Id.* Foster Mother stated that T.M.T., Jr. is doing well and is opening up and speaking with the therapist. *Id.* She explained that T.M.T., Jr.'s behavioral specialist has her phone number and they communicate via text messages to ensure that T.M.T., Jr. is well-behaved. *Id.* T.M.T., Jr. also has a Therapeutic Staff Support ("TSS") worker for twenty hours in the school for the blind, where he is entering first grade. *Id.* at 59. Foster Mother stated that T.M.T., Jr. has been doing better in school with the TSS worker. *Id.* at 58-59. Foster Mother testified that some of T.M.T., Jr.'s test results show that he is functioning at a third grade level. *Id.* at 59.

Foster Mother explained that N.C.T. is in pre-school and will enter kindergarten. *Id.* There were no concerns for N.C.T. in pre-school. *Id.* Foster Mother also had no concerns for the behavior of the Children in her

home. *Id.* She testified that she would be able to continue to handle the medical and behavioral needs of the Children, and would speak with their physicians. *Id.*

On cross-examination by counsel for Paternal Grandmother, Foster Mother stated that she intends to change the last name of the Children in order to give them her last name. *Id.* at 60. She also stated that she permitted her adopted sons to continue to have contact with their biological family. *Id.*

On August 13, 2014, the trial court entered its order, granting Foster Mother's petitions for adoption, finding adoption by Foster Mother to be in the best interests of the Children, and denying Paternal Grandmother's petitions for adoption. Based on the testimonial and documentary evidence, the trial court found the following.

\* \* \*

6. Petitioner [Foster Mother] has had continuous custody and care of the [C]hildren since February 1, 2013. (N.T. 7/14/2014, pg. 48, lines 9-12).

7. Petitioner [Paternal Grandmother] has not had significant contact with the [C]hildren for over one year. (N.T. 7/14/2014, pgs. 19, 23, 24).

8. D.H.S. has given its consent to . . . [Foster Mother] to adopt the [C]hildren. (N.T. 7/14/2014, pgs. 50, 52-53).

9. The record developed at trial clearly establishes that there is a strong bond between the [Children] and [Foster Mother]. (N.T. 7/14/2014, pgs. 49-53, 57).

10. There is no evidence in the record that establishes any current bond between the [Children] and Petitioner [Paternal Grandmother]. The record, arguably, shows that there is clearly a lack of such an existing bond.

11. The record is replete with testimony as to unsafe conditions and/or descriptions of injuries, health issues and untreated medical conditions of the [C]hildren during the period that they were in the care of Petitioner [Paternal Grandmother]. (N.T. 7/14/2014, pgs. 28, 32, 35-38).

12. The trial court had the benefit of live testimony and the ability to see the demeanor of the witnesses. Accordingly, the trial court had the ability to evaluate and measure the sincerity of their responses of all witnesses who testified. The trial court finds:

a. Petitioner [Foster Mother] consistently testified credibly.

b. Petitioner [Paternal Grandmother] provided testimony which was either questionable, contradictory, or conflicting. Accordingly, her testimony is less reliable as it lacks consistent credence with respect to material issues.

Trial Court Opinion 1/13/15, at 2-3.

Thereafter, Paternal Grandmother retained her present counsel, who entered an appearance on September 24, 2014. On September 24, 2014, Paternal Grandmother filed a petition in the trial court seeking permission to file an appeal *nunc pro tunc*. The trial court granted the petition on October 1, 2014. On October 10, 2014, Paternal Grandmother filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

---

[5] As this is an appeal designated as a Children's Fast Track Case, we have made every effort to decide it expeditiously. ***See In re T.S.M.***, 71 A.3d 251, 261 n.21 (Pa. 2013). However, the certified record was not

- 16 -

In her brief on appeal, Paternal Grandmother raises three issues, as follows.

A. Whether the trial court committed reversible error in making a finding that it is in the best interest of the [C]hildren to deny the adoption petition filed by [Paternal Grandmother]?

B. Whether the trial committed reversible error in making a finding that there is no evidence that established any current bond between the [C]hildren and [Paternal Grandmother]?

C. Whether the trial court's determinations as set forth in [A-B] above were clearly supported by the preponderance of the evidence?

Paternal Grandmother's Brief, at 1.

Initially, in their brief, the Children complain that Paternal Grandmother's brief does not contain a statement of the facts necessary to determine the points in controversy, nor does it reference any place in the record to show that she raised or preserved a question for appeal. The Children suggest that we should quash the appeal for failure of Paternal Grandmother's brief to comply with Pa.R.A.P. 2117(a)(4) and (c)(4). The Children also complain that Paternal Grandmother's brief fails to provide a statement of the facts with references to the record necessary for substantive review, and fails to cite to the record in the Argument section, in violation of and 2119(c), (d), and (e). The Children ask us to deem Paternal Grandmother's issues waived pursuant to Pa.R.A.P. 302(a).

transmitted to this Court until January 23, 2015. As a result, the briefing schedule was delayed. Moreover, both parties requested extensions of time to file their briefs. Accordingly, the extensions resulted in another month of delay in listing this case for disposition by a merits panel.

- 17 -

This Court may quash or dismiss an appeal if an appellant fails to conform to the requirements set forth in the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101; *Laird v. Ely & Bernard*, 528 A.2d 1379 (Pa. Super. 1987). "[A]s a practical matter, this Court quashes appeals for failure to conform to the Rules of Appellate Procedure only where the failure to conform to the Rules results in the inability of this Court to discern the issues argues on appeal." *Kern v. Kern*, 892 A.2d 1, 6 (Pa. Super. 2005) (citation omitted). While we cannot condone Paternal Grandmother's failure to conform to the Pennsylvania Rules of Appellate Procedure in her brief, the failure has not hampered our review. We are able to discern the issues that Paternal Grandmother raises on appeal. Thus, we will not quash or dismiss the appeal.

We will address Paternal Grandmother's issues together. Paternal Grandmother asserts that she has been a primary family resource for the Children since their birth, and that she and the Children have an established, maternal, loving and caring family bond. She explains that she cared for the Children between 2009 and July of 2011, when DHS removed them from her care, and placed them in foster care. Citing *Peters v. Costello*, 891 A.2d 705 (Pa. 2005), she asserts that she stood *in loco parentis*, and established a loving relationship with the Children during the two-year period that she cared for them. She claims that, as the Children's grandmother and caregiver, she clearly bonded with the Children. She contends that the

removal of the Children from her care and placement in the care of another person had a negative effect on the Children's emotional needs. Paternal Grandmother urges that her adoption of the Children will serve the Children's best interests, as she is their paternal grandmother.

On appeal from a decree of adoption, our standard of review is an abuse of discretion. **In re B.L.L.**, 787 A.2d 1007, 1015 (Pa. Super. 2001). Thus, an adoption decree will be vacated only if the challenging party demonstrates the invalidity of the decree by clear and convincing evidence. **Id.** "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." **Bulgarelli v. Bulgarelli**, 934 A.2d 107, 111 (Pa. Super. 2007) (quotation omitted).

A decree of adoption is entered upon presentation of competent evidence that the adoption is in the child's best interest. **In re B.L.L.**, 787 A.2d at 1015. "The proceedings in an adoption hearing are unique and involve parties, experts, investigators and non-parties to a greater extent than in custody hearings, but ultimately are subject to the same standard, that being the best interest of the child." **Id.** citing **In re Adoption of A.S.H.**, 674 A.2d 698 (Pa. Super. 1996).

Further, the best interest determination in adoption matters is made on a case-by-case basis, and requires a weighing of the factors set forth in section 2724 of the Adoption Act, 23 Pa.C.S.A. § 2724. *In re B.L.L.*, 787 A.2d at 1015 *citing **In re Adoption of A.S.H.**, **supra***.

Section 2724 of the Adoption Act provides in pertinent part:

> **(b) Investigation.—**The court may request that an investigation be made by a person or public agency or, with its consent, a voluntary agency, specifically designated by the court to verify the statements of the petition and such other facts that will give the court full knowledge of the desirability of the proposed adoption, or the court may rely in whole or in part upon a report earlier made under section 2535 (relating to investigation). In any case, the age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child.

23 Pa.C.S.A. § 2724.

The trial court found that Foster Mother had continuous custody and care of the Children since February 1, 2013. Trial Court Opinion, 1/13/15, at 2 (citing N.T. 7/14/2014, pg. 48, lines 9-12). The trial court also found that Paternal Grandmother had no significant contact with the Children for over one year. Trial Court Opinion, 1/13/15, at 2 (citing N.T. 7/14/2014, pgs. 19, 23, 24). Paternal Grandmother testified that she visited the Children for approximately one month after they were removed from her care on July 7, 2011, but she could not take more time from work to continue visiting them. N.T., 7/14/14, at 19.

The trial court stated the following.

This court, in assessing what is in the best interest of the [C]hildren in the instant contested adoption, is called upon to choose the more appropriate party or parties. The trial court gives great weight to [Foster Mother,] as she has been involved in the day[-]to[-]day parenting of the [C]hildren[,] and has provided them continuous care for well over a year. The court, in making its best interest analysis, must also consider bonding. Scholarly research suggests[,] "Bonding is a significant reciprocal attachment which both parties want and expect to continue, and which is interrupted or terminated at considerable peril to the parties involved." *Bonding is a Vital Issue: Appellate Courts Agree*, by James Kenny[,] PhD [sic] and Mask Bontrager, MSW [sic], JD. [sic], pg. 1. This same research reveals that relationships arising out of bonding outweigh relationships based merely on kinship. **See [i]d.** at 2. In the instant case, the record provides more than clear and convincing evidence of the existence of a strong mutual bond between the [C]hildren and [Foster Mother].

* * *

In the instant case, the [C]hildren have been in the continuous care of [Foster Mother] for over one year without interruption or incident. Thus[, Foster Mother] has provided a stable environment best suited for the continued long-term growth and development of the [C]hildren. Accordingly, the court finds the welfare of the children is best safeguarded in the stability they have become accustom [sic] to with [Foster Mother].

* * *

It would be destructive and certainly not in the best interest of the [C]hildren to remove them from their existing, stable environment.

* * *

Based on the foregoing findings of fact, applicable law and legal analysis, the weight and sufficiency of the evidence support the granting of the petitions of [Foster Mother]. The trial court's decision is supported by the record developed at trial and is supported by the established law of the Commonwealth. The trial court's ruling is in the "best interest" of the [C]hildren.

- 21 -

J-S35016-15

Trial Court Opinion, 1/13/15, at 4-5.

The trial court's determination that the Children's best interests are served by being adopted by Foster Mother is supported by ample, competent evidence in the certified record. The trial court found that Foster Mother provided a stable environment best suited for the continued long-term growth and development of the Children. The court found that the welfare of the Children is best safeguarded in the stability provided by Foster Mother. Ms. Riley testified that Foster Mother ensures that the Children are safe, and that their medical, educational, and daily needs are met. N.T., 7/14/14, at 53. Ms. Riley opined that there is a bond between T.M.T., Jr. and Foster Mother. *Id.* at 49. Ms. Riley testified that, on behalf of DHS, she consented to Foster Mother's petition to adopt T.M.T., Jr. because the Children seem bonded to Foster Mother, Foster Mother addresses the Children's needs, and she has requested to adopt them. *Id.* at 50-51. Ms. Riley also testified that Foster Mother's interactions with N.C.T. are loving, kind, and attentive. *Id.* at 52. Ms. Riley believes that it is in the Children's best interest to be adopted by Foster Mother. *Id.* at 51, 53.

Paternal Grandmother offered the only testimony concerning what she does to support the physical, mental and emotional needs and welfare of the Children, and the bond between her and the Children. Paternal Grandmother testified that it is in the best interest of the Children for her to adopt them because they are a family, and she kept them healthy, has fun

- 22 -

with them, and loves them. *Id.* at 20. Paternal Grandmother relies on *Peters* to support her argument that she stood *in loco parentis* to the Children when they lived with her between 2009 and 2011, and, therefore, has a bond with them.

In *Peters*, our Supreme Court outlined the relevant principles as follows:

> The term *in loco parentis* literally means "in the place of a parent." *Black's Law Dictionary* (7th Ed. 1991), 791.

> > The phrase "*in loco parentis*" refers to a person who puts oneself [sic] in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. . . . The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child.

*Peters*, 891 A.2d at 710 (citation and footnote omitted).

Paternal Grandmother did not act *in loco parentis* when the Children were placed in foster care. Rather, she was a kinship care provider, and DHS had legal custody of the Children. Thus, her *in loco parentis* argument is misplaced. **See In re N.S.**, 845 A.2d 884, 887 (Pa. Super. 2004) (former foster parent who had physical possession and provided day-to-day care to children lacked standing to pursue adoption, visitation, or custody where county children and youth agency held legal custody of children); **see also In re Adoption of Crystal D.R.**, 480 A.2d 1146 (Pa. Super. 1984) (foster

- 23 -

parents who petitioned to terminate parental rights of natural parents did not stand *in loco parentis* to children because state agency had responsibility for actual care and physical custody of the children and had legal custody of minors).

Paternal Grandmother also cites ***Commonwealth ex rel. Jordan v. Jordan***, 448 A.2d 1113 (Pa. Super. 1982), to support her argument that, in a best interest analysis, courts examine the primary caregiver factor, recognizing that the children become strongly attached to those who parent and tenderly care for them. ***See*** Paternal Grandmother's Brief, at 4. Based on the primary caretaker doctrine, Paternal Grandmother asserts that she established a bond long before the Children were removed from her home by caring for them and tending to their physical and emotional needs.

Paternal Grandmother's contention lacks merit as this Court has ruled that the primary caretaker doctrine is no longer viable in light of the statutory factors enumerated in the Child Custody Act. ***See W.C.F. v. M.G.***, 2015 PA Super 102 (Pa. Super. 2015); ***M.J.M. v. M.L.G.***, 63 A.3d 331, 338 (Pa. Super. 2013).

Even if the primary caretaker doctrine were applicable to the instant adoption case, the facts would not support a finding that Paternal Grandmother's adoption of the Children is in their best interest. The testimony of Ms. Redguard established that, when the Children were in the care of Paternal Grandmother, she failed to take T.M.T., Jr. to

ophthalmology appointments for his special needs glaucoma condition. Ms. Redguard's testimony also established that Paternal Grandmother allowed both of the Children to develop scabies and suffer bites. Paternal Grandmother allowed N.C.T. to be filthy, T.M.T., Jr. to wear his soiled underpants in hot weather, and both Children to smell of a foul odor. Notably, while Paternal Grandmother had the Children in kinship care, she allowed Father to transport them to visit Mother, although he had a contentious relationship with Mother. These matters resulted in the Children's removal from Paternal Grandmother's care on July 7, 2011.

The record also supports the trial court's determination that Paternal Grandmother did not have significant contact with the Children for over one year after the agency removed them from her home. Although Paternal Grandmother continued to visit the Children for approximately one month after they were removed from her care, she no longer pursued visitation after that time, as she believed her work obligations were more important. We find it significant that Paternal Grandmother allowed the Children to remain in foster care without pursuing visitation through the time of the July 14, 2014 hearing on the adoption petitions.

In the context of a termination of parental rights matter, this Court observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re*

***K.Z.S.***, 946 A.2d 753, 764 (Pa. Super. 2008). Although Paternal Grandmother is not a natural parent of the Children, she is their blood relative for purposes of the adoption petition. ***See*** 23 Pa.C.S.A. § 2531(c). T.M.T., Jr. and N.C.T. have been in foster care, and out of Paternal Grandmother's care, since July of 2011. They were approximately four years old and two years old, respectively, at the time of their removal from her care and placement in foster care. She has not visited them since August, 2011. Thus, we find that the trial court did not abuse its discretion in concluding that the Children's bond with Paternal Grandmother, who did not visit the Children in nearly three years, is attenuated, at best.

Likewise, Paternal Grandmother testified that she loves the Children. N.T., 7/14/14, at 20. In the context of termination of parental rights, this Court stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). We find no abuse of the trial court's discretion in concluding that Paternal Grandmother's professed love for the Children is not sufficient for the court to grant her adoption petition and deny Foster Mother's adoption petition where she has failed to demonstrate her love for the Children through her actions.

In the context of termination proceedings, this Court also held that it is appropriate to consider a child's bond with his or her foster parents. ***See In***

*re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). Regarding the bond analysis, in

*In re: T.S.M.*, our Supreme Court instructed as follows.

> The "utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

> The Superior Court has emphasized that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. "[E]ven the most abused of children will often harbor some positive emotion towards the abusive parent." "The continued attachment to the natural parent, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding."

> Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.

> * * *

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically, but instead always with an eye to the best interests and the needs and welfare of the particular children involved. . . . Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

*In re: T.S.M.*, 71 A.3d at 267-269 (citations omitted).

In view of our Supreme Court's instruction in *In re: T.S.M.*, we find that the trial court properly focused on the existence of a positive bond between the Children and Foster Mother. There was ample, competent testimony in the record from Ms. Riley to support the trial court in finding that the Children have a stronger bond with Foster Mother than with Paternal Grandmother, and that Foster Mother, who is anxious to adopt the Children, provides them with a stable home and provides for all of their needs and welfare. We, therefore, affirm the orders granting Foster Mother's adoption petitions, and denying Paternal Grandmother's adoption petitions.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/13/2015